## HAYDEL v. MUTUAL RESERVE FUND LIFE ASS'N.

(Circuit Court of Appeals, Eighth Circuit. November 5, 1900.)

### No. 1,408.

1. **LIFE INSURANCE—ASSESSMENT POLICY—WHAT CONSTITUTES.**

   A life insurance company, authorized by its charter to do business only on the assessment plan, does not exceed its authority by the issuance of a policy which requires the payment of fixed premiums, or such ratio or multiple of such premiums as shall be determined by the directors, and provides, in effect, that the excess of such premiums above what is required to meet current mortuary claims, expenses, etc., shall be paid into a reserve or emergency fund, and that, after the expiration of a certain number of years, the policy holder may surrender the policy, and receive as its surrender value a certain per cent. of the amount remaining in the reserve fund and directly contributed by him, or at his option have the same applied to extend the obligation of the company to pay the *principal* sum in event of death. Such a policy is not an endowment policy, but retains the essential features of the assessment plan.

2. **SAME—CONSTRUCTION OF POLICY—POWER TO INCREASE ASSESSMENTS.**

   Where the constitution of a mutual life insurance company, doing business on the assessment plan, authorized the board of directors to fix the amount of each assessment at such sum as it should deem necessary to meet death losses, and apportion the same among the members, and its policies provided that they should be governed by and construed according to the constitution, a memorandum on the back of a policy, giving a table of rates on each $1,000 of insurance, which "shall be the basis of the assessment rate for each member according to the age," must be construed as merely fixing the basis for apportionment as between the members of different ages, and at most as an estimate of the probable cost of insurance, the accuracy of which would be determined by the actual experience of the company, and not as a contract that the assessments should not exceed those given.

3. **SAME—CONSTRUCTION BY PARTIES.**

   When the provisions of a policy leave it in doubt as to whether a limitation was thereby placed on the power of the company to make assessments exceeding a certain rate, the making of numerous assessments above such rate, and their payment by the policy holder without objection, constitutes a construction by the parties which will be followed by the courts in determining their respective rights.

4. **SAME—DEFENSES AGAINST INCREASED ASSESSMENTS.**

   A provision of the constitution of an assessment life insurance company that its reserve fund above a certain sum and in excess of sums represented by outstanding bonds "may be applied to the payment of claims, in excess of the American Experience Table of Mortality," or to make up any deficiency existing in the death fund after the collection of an assessment, is permissive, rather than mandatory; and, where other provisions vest

the board of directors with power to devote the reserve fund to other purposes, it cannot be held that an assessment was invalid because the reserve fund was largely in excess of the sum named.

**5. SAME.**

A provision of the constitution of an assessment life insurance company that at the expiration of each period of five years the reserve fund should be apportioned between the existing members in each class, which should include the holders of all policies issued in the same year, and bonds issued to each member for his proportion, which after ten years might be used in payment of assessments, and that at such apportionment "the rate of assessment may be changed to correspond with the actual mortality experience of the association," cannot be construed to deprive the directors of the power given them by other provisions, and necessary to the continued life of the company, to fix the amount of each assessment at such sum as might be necessary to meet the company's losses.

**6. SAME—FAILURE TO PAY ASSESSMENT—WAIVER OF PROMPT PAYMENT.**

A policy holder in an assessment life insurance company died 3 days after the maturity of an assessment, not having paid such assessment. His policy had been in force for 14 years, during which he had paid more than 70 assessments, all but 5 of which were paid on the day they matured, and, of such 5, 4 were paid on the next day, and 1 on the second day. In each instance, except one, a receipt was given conditioned that the member was in good health, and that the acceptance of the payment after maturity should not be regarded as a precedent. The last default was 4 years before the death of the insured. *Held*, that such facts did not establish a course of dealing which would sustain a claim that the company had waived payment on the day of maturity.

In Error to the Circuit Court of the United States for the Eastern District of Missouri.

In this case Mary E. Haydel, the plaintiff in error and the plaintiff below, sued the Mutual Reserve Fund Life Association, the defendant in error, to recover the amount alleged to be due on two policies of insurance issued by the defendant company on the life of her deceased husband, F. L. Haydel, one of which was executed August 1, 1884, in the sum of $10,000, and the other on September 15, 1884, in the sum of $5,000. Both policies were issued on what is termed the "assessment plan," and remained in force until March 3, 1898. On January 12, 1898, an assessment, known as "Mortuary Call No. 96," was levied on the first of the above-mentioned policies in the sum of $141.90, which sum, by the terms of the assessment, was payable February 1, 1898, but might be paid on or before March 3, 1898. On January 28, 1898, a similar assessment, also designated "Mortuary Call No. 96," was levied on the second of the above policies in the sum of $70.95, which sum was likewise made payable, by the terms of the assessment, on or before March 3, 1898. F. L. Haydel, the plaintiff's husband, although duly notified of these assessments, declined to pay them, and died on March 6, 1898, leaving them wholly unpaid. Under a provision contained in the policies the failure to pay these assessments, if they were legally levied, rendered the policies void, and the defendant company relied on this provision as a defense thereto. The plaintiff pleaded that these assessments known as "Mortuary Call No. 96" were unlawfully levied, and that the policies had not become forfeited when her husband died. The reasons that were assigned and are principally relied upon to support this contention are as follows: First. It was said that the defendant company was incorporated under the laws of New York to do business solely on the "co-operative or assessment plan," and that after its organization, and after the issuance of the policies in suit, it began to issue a class of policies known as "five-year combination option policies," which were not authorized by its charter, not being issued on the co-operative and assessment plan; that it amalgamated this business with its authorized business by levying assessments on all its members to pay losses incurred under its unauthorized policies, and that mortuary call No. 96 was levied in part for that purpose. Second. It was urged, in substance, that by a table or rate

of assessment indorsed on the policies in suit it was stipulated that the rate of assessment should not exceed $3.50 for each $1,000 of insurance, making each assessment in the aggregate on the $10,000 policy $35, and that assessments at that rate were paid until 1895, when the rate was unlawfully raised by levying an assessment every two months to the amount of $82.80 on the $10,000 policy; that the assessment was again raised in 1898 by requiring a payment of $141.90 on February 1, 1898, on the $10,000 policy, and that this latter assessment was unlawful. Furthermore, it was contended that an agreement existed between the insurer and the insured to the effect that the reserve fund of the defendant company "above $100,000 and in excess of sums represented by outstanding bonds should be applied to the payment of claims in excess of the American table of mortality, and when any claim by death was due to make up any deficiency that might then exist in the death fund"; and that this agreement was not kept by the defendant company when mortuary call No. 96 was levied, by virtue of which fact the call was also illegal. It was also urged that by the terms of the policies the rate of assessment thereon, to correspond with the actual mortality experience of the company, could be changed only at the expiration of periods of five years after the issuance of the policies,—that is to say, in 1889, 1894, and 1899,—but that instead thereof the defendant increased the assessment at the beginning of the year 1898 by levying mortuary call No. 96 to the amount of $141.90 on the $10,000 policy, and that such increase rendered the assessment void, it not having been raised at the end of the quinquennial period. It was finally claimed that by acts in pais the defendant company had waived the right to exact payment of assessments on the precise day of maturity. These were, in substance, the principal grounds relied upon in the trial court to avoid a forfeiture of the policies for nonpayment of the assessments due on March 3, 1898. They were each overruled, and a direction was given to the jury that under the evidence adduced by the plaintiff there could be no recovery. (C. C.) 98 Fed. 200. The plaintiff below has brought the case to this court for review.

E. T. Farish, for plaintiff in error.

James C. Jones (William C. Jones, George Burnham, Jr., and Sewell T. Tyng, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It may be conceded at the outset that, if the assessment on the policies which was due on or before March 3, 1898, was unlawfully levied, the policies remained in force on March 6, 1898, when the plaintiff's husband died; and, taking this proposition for granted, we shall proceed to consider whether the assessment in question was, for any reason, illegal. The first point to be determined is whether the issuance by the defendant company "of the five-year combination option policies," so termed, rendered the assessment due on March 3, 1898, unlawful. The principal objection urged to the validity of the latter class of policies is that they were endowment policies, and in this behalf counsel for the plaintiff in error asserts that they were endowment policies because "the company undertook to pay or make return of a specified sum of money at the termination of certain designated periods during the lifetime of the assured." An inspection of one of these policies, which has been inserted in the record, discloses the fact that by the terms of the policy, as expressed on its face, the insured is required to pay a stated sum at stated periods, instead of paying an uncertain sum, which is fixed on each occasion

by the executive committee of the company; and in this respect this class of policies does differ from the company's ordinary policy. A critical examination of the conditions appended to the policy discloses, however, that out of the premiums thus agreed to be paid the company is authorized to deduct "the amount included therein for dues, for expenses, and other expenses chargeable against moneys received from mortuary calls as provided in the constitution and by-laws, medical fees, and amounts paid for the surrender and cancellation of policies," and that, "after paying the death and disability claims through the death fund," it is required to add the remainder "to the reserve or emergency fund." This class of policies also contain provisions to the following effect: That there shall "be due to the association for premiums the amount mentioned on [the face thereof], or such multiple or ratio thereof as its executive committee may determine"; that, should said policies continue in force, "the actuary of the association will annually after the eleventh year while the same is in force determine and credit thereto the equitable proportion to which this policy is entitled * * * from its direct contribution to the reserve or emergency fund for the tenth respective year prior to said credit, which amount so determined and credited may be used towards payment of future premiums"; that, after such policies have been in force for the full term of five years, "if the member notify the association, in writing, at least six months before the expiration of any policy year, that he desires to surrender this policy, and receive therefor its cash surrender value, the actuary of the association will determine the amount remaining in the reserve or emergency fund * * * directly contributed thereto by said member, and the association will, upon surrender and cancellation of this policy while in force, pay to said member in cash at the end of five years fifty per cent., at the end of six years fifty-five per cent. (with an additional five per cent. for each added year of continuous membership not exceeding one hundred per cent.), of the net amount so determined"; and that after such contracts have been in force for the full term of five years, and during their continuance, "the member, by giving at least thirty days' notice in writing to the association. may have the amount to which he would have been entitled as a cash surrender value under [the preceding] provision applied to extend the obligation to pay the principal sum in event of death for such period as said value will meet the dues for expenses fixed by the board of directors, and the full tabular cost as per American Experience Table of Mortality at attained age, at the expiration of which period said obligation shall cease and determine." While these provisions are somewhat involved; and to a certain extent difficult of comprehension, still we think it is clear that the policies in question which contain the same are not endowment policies; and we are also of opinion that they are not so far variant from ordinary policies issued on the co-operative or assessment plan as to warrant a ruling that the defendant company exceeded its power in issuing them. They lack some of the essential features of endowment policies. While the premium at first reserved is a definite sum, yet by further provisions the executive committee

104 F.—46

of the company can require the holders of such policies to pay a greater or less sum than that stipulated to be paid on the face of the policies, if the condition of the defendant company at any time renders such action necessary. It is true that a person who takes out a policy of insurance on the five-year combination option plan enjoys certain privileges which ordinary members do not enjoy,—such as the right after five years, upon due notice, and upon surrender of his policy, to receive a certain per cent. of the net amount remaining in the reserve or emergency fund which has been directly contributed by him, or to have the amount to which he is so equitably entitled applied to extend the obligation to pay the principal sum for such period as the ascertained surrender value will pay the member's share of expenses and the cost of insurance at his attained age. But it will be observed that such policy holder is not entitled to receive any fixed amount by way of dividends or as surrender value, and that he shares with other members in the success of the company, and suffers loss as they suffer, if the reserve or emergency fund is depleted by unexpected losses. In exchange for the peculiar privileges which a member of this class enjoys, he agrees to pay stated sums at stated intervals (which we assume to be somewhat in excess of the average assessments paid by the ordinary policy holder), unless the executive committee, in the exercise of its discretionary powers, elects to compel him to pay a multiple or ratio of the specified premium. In view of all the provisions which the form of policy in question contains, we conclude that such policies were issued substantially on the co-operative or assessment plan, and that nothing therein found in the shape of special privileges accorded to the policy holder would justify a decision that they were unauthorized by the defendant's charter. It is quite likely that the policy in question was adopted to attract the patronage of a class of persons who prefer to pay specified sums at stated intervals, instead of assessments, which may vary in amount; but, when all the provisions of the contract are considered, it seems to retain all the essential features of assessment insurance.

The next question to be determined—and it is the one to which special prominence is given in the argument—is whether mortuary call No. 96 was illegal as to the deceased because of an agreement that assessments on his policies should be levied at the rate of $3.50 per thousand, bimonthly. The claim to this effect is predicated on the fact that on the back of each of the policies, after the signature thereto of the president and secretary, is found an indorsement as follows:

"Table of Rates.

"Admission Fee.

"$1,000, $8.00; $2,000, $12.00; $3,000, $15.00; $5,000, $20.00; $10,000, $30.00.

"Dues.

"The dues for expenses are limited to $2.00 on each $1,000, payable annually in advance.

"Assessment Rate Table.

"No assessments will be made while there remains in the death fund a sum sufficient to pay existing claims in full.

"The basis of the assessment rate for each member according to the age taken at the nearest birthday on each $1,000, shall be as follows."

Then follows a scale of rates in the form of a table showing the rate of assessment from the age of 15 to 65. An examination of this table shows that from the age of 25 to 33 the rate increases 2 cents each year; from 33 to 50, 4 cents each year; from 50 to 60, 25 cents each year; and from 60 to 65, 50 cents each year. At the age of 56 the rate specified in this table is $3.50, and the deceased is said to have been of that age when the policies in suit were issued. On the other hand, section 5 of article 11 of the defendant's constitution clearly confers authority to make such assessments as the board of directors deem necessary to meet death losses, the provision being that "on the first week day of the months of February, April, June, August, October, and December of each year (or at such other dates as the board of directors may from time to time determine) an assessment shall be made upon the entire membership in force at the date of the last death to the audited death claims prior thereto, for such a sum as the executive committee may deem sufficient to meet the existing claims by death, the same to be apportioned among the members according to the age of each member." Section 8 of the same article also confers a general power to make assessments, the language being that "the board of directors shall have authority to fix and determine the amount of benefits for which certificates of membership will be issued, rates of assessment, admission fees, and annual dues, and to adopt such other rules and regulations as they may deem best for the interest of the association." The tenth paragraph of the policies in suit also declares that "the entire contract contained in this certificate and said application, taken together, shall be governed by, subject to, and construed only according to the constitution, by-laws, and regulations of said association and the laws of the state of New York, the place of this contract being expressly agreed to be the home office of said association in the city of New York." The proof discloses that when mortuary call No. 96 was levied, and the demand was made upon the deceased for its payment, he did not decline to pay the same for the reason that by the terms of his policies assessments could not be levied thereon exceeding $3.50 per thousand bimonthly, but his refusal to pay was based on other grounds.

On this state of facts the question to be determined is whether the indorsement on the back of the policies should be regarded as an agreement between the insured and the insurer, binding the latter not to make assessments in a sum greater than $3.50 per thousand bimonthly, or whether it should be regarded merely as a memorandum showing how assessments would be apportioned as between persons of different ages, and the probable amount of the bimonthly assessment as then foreseen and estimated. For several reasons we incline to the opinion that the latter is the correct view. In the first place, the defendant was a mutual company operating on the assessment plan. It had no means wherewith to pay expenses and death losses, other than such as it derived from assessments on its members. It is by no means probable, therefore, that by the indorsement in question it intended to devest itself of the authority plainly conferred by its constitution upon the board of directors to make

such assessments as might at any time be found necessary to meet its liabilities, or to tie its hands so that it could not exercise this necessary power. In the second place, the cost per year to a person aged 56 of a policy for $10,000 at the rate indicated by the indorsement would only be $210, which is a sum so far below the usual cost of that amount of insurance to a person of that age as constrains us to believe that the deceased did not himself regard the indorsement as a contract binding the defendant to furnish insurance at that rate, without reference to what might be its actual experience. It is most probable, we think, that he understood it to be an estimate of the probable cost of insurance, the accuracy of which would be determined by the class of risks which it succeeded in obtaining. In the third place, if such a wide departure from the principle of operation described in the defendant's constitution was contemplated by the parties as an agreement for a fixed or level rate of assessment irrespective of the company's actual experience, then it is most likely that a stipulation of that nature would have been embraced in the body of the contract, instead of being indorsed in the form of a memorandum on the back of the policies. And lastly, if it be conceded that the memorandum in question is adequate to raise a doubt as to the proper interpretation of the contract, then the contract should be construed as the parties themselves saw fit to construe it in their dealings with each other. Chicago G. W. Ry. Co. v. Northern Pac. Ry. Co. (C. C. A.) 101 Fed. 792, and cases there cited. It is conceded that the rate of assessment was raised above the rate specified in the memorandum on the back of the policies, and that the increased rate was paid by the deceased without dissent. The proof shows that after the policy had been in force for something more than three years numerous bimonthly assessments for the sum of $52.50 were levied and paid, and that subsequently numerous bimonthly assessments to the amount of $82.80 each were likewise levied and paid. Moreover, the final refusal to pay mortuary call No. 96 was not based on the ground that the defendant company lacked the power under its policies to make the assessment. For all of these reasons we conclude, as above stated, that the indorsement on the policies can be regarded in no other light than a memorandum showing the basis upon which assessments would be apportioned as between members of different ages, and as an estimate of the probable amount of the assessments, which was not intended to devest the board of directors of the power plainly conferred on them by the charter of the company to make such assessments as might at any time be found necessary to meet its death losses.

The next proposition is that the defendant was bound to pay the death claims intended to be paid with the proceeds of mortuary call No. 96 out of its reserve fund, and that the call was illegal for that reason. This contention is based on the following provision found in the defendant's constitution, which is copied substantially into its policies:

"The reserve fund above $100,000, and in excess of sums represented by outstanding bonds, may be applied to the payment of claims in excess of the American Experience Table of Mortality, and when any claim by death is

due. after a mortuary assessment upon each member of the association has been made according to the rules of the association, to making up any deficiency that may then exist in the death fund." Article 10, § 3.

The trial court answered this proposition as follows:

"It is to be noted in considering this excuse (that is, the excuse for not paying mortuary call No. 96) that the plaintiff entirely fails to aver that the reserve fund exceeded its bond obligations, or that the mortality experience of the defendant association was in excess of the American Experience Table of Mortality. In other words, in the allegation that there was this large amount of reserve fund the pleader utterly fails to observe that this particular fund could not have been devoted to the payment of the death claims unless such claims were in excess of the American Experience Table of Mortality. Entirely apart from this, however, it appears from the different provisions of the constitution and by-laws, and in the subsequent amendments of the constitution and by the subsequent development of the schemes of business of this company, that the board of directors had the power to devote its reserve fund in any manner they saw fit, provided it be made subject to the general purpose of the corporation and to the business being carried on for the benefit of the members."

In addition to the point thus made by the trial court that the reply was insufficient to sustain the plaintiff's contention, it is to be observed that the language above quoted from the constitution, and on which the plaintiff's contention is founded, is permissive, rather than mandatory, and seems to have been designed to vest in the board of directors of the defendant company the right to determine when such conditions existed that its reserve fund could be safely or properly used to pay accumulated death losses without making an additional assessment. Under the laws of New York (Laws 1892, c. 690, § 205) the defendant was required to keep on hand the amount of one assessment, and was also required to keep on hand the amount of two assessments before apportioning its reserve, or permitting the same to be applied in reduction of assessments upon its members. When mortuary call No. 96 was made, two assessments, it seems, such as were required by law, amounted to $1,200,000. The company had bonds outstanding to the amount of $383,962.43. It had executed bond statements to the amount of $2,583,602.39, and the amount of death claims approved and accruing were in the neighborhood of $750,000. The amount of reserve required by the company's by-laws was $100,000. At the same time the amount of its reserve fund on hand and invested was $3,305,997.25. It will be seen, therefore, that the several items first enumerated exceeded the reserve fund on hand and invested to the amount of $1,711,567.57. It is claimed in behalf of the plaintiff in error that the bond statements, aggregating $2,583,602.39, were not, in any proper sense, liabilities of the defendant company at the time mortuary call No. 96 was levied. But, be this as it may, we are of opinion that the directors of the defendant company were under no obligation to defer levying the assessment, or to pay the accrued and accruing death losses, then amounting to $750,000, out of its invested reserve fund, if, in the exercise of their discretionary power, they deemed it for any reason unwise or impolitic to do so.

Section 4 of article 10 of the defendant's constitution contains the following provision, which is also found, in substance, in the defendant's policies:

"After the expiration of each period of five years during the continuance of a certificate of membership, a bond shall be issued for an equitable proportion of the reserve fund, and the principal of said bond shall be available ten years from its date towards paying future dues and assessments under said certificate: and, should membership under said certificate cease from any cause, said bond shall at once become null and void, and any portion of said principal not thus used shall be applied to increase the bonds issued at the next quinquennial apportionment to other members of the association holding certificates issued during the same year as the aforesaid certificate, *and at which apportionment the rate of assessments may be changed to correspond with the actual mortality experience of the association.*"

In view of that clause of the section which has been italicized, learned counsel for the plaintiff in error contends that there was an implied agreement on the part of the insurer that it would not raise the rate of assessment indorsed on the back of its policies, except at quinquennial periods, and that, as the rate was raised in 1898, when mortuary call No. 96 was levied, and, as that was not one of the quinquennial periods, the call was illegal and the deceased was under no obligation to pay the same. If this clause is construed to mean that the board of directors could not change the rate of assessment except at quinquennial periods, no matter how great the need for such a change, then it conflicts with other provisions of the constitution, already quoted, which in broad terms gave the board power to make assessments at stated periods "for such a sum as the executive committee may deem sufficient to meet the existing claims by death," and "to fix and determine * * * rates of assessment, admission fees, and annual dues." A construction of the clause now in question must accordingly be sought which will harmonize with the other provisions of the constitution, and, inasmuch as the power to make such assessments as are adequate to meet death claims is vital to the successful operation of the company, a construction of the clause should be sought which will, if possible, save to the managing officers this very necessary power. It will be observed that section 4 of article 10 of the constitution deals mainly with the subject of issuing bonds to members, representing their respective interests in the reserve fund, the provision being that they shall be issued at the expiration of 5 years, and be available at the end of 10 years from their date for the payment of assessments, and that, if any membership should cease, the bond of that member shall become void, and the share of the reserve fund which it represents inure to the benefit of those who became members during the same year as the one whose membership ceases. It is then said, "At which apportionment the rate of assessment may be changed to correspond with the actual mortality experience of the association." Certificates of membership in the defendant company are thus grouped into classes, those issued during the same year forming a class by themselves; and the policy holders of each class take the share of the reserve fund that would have been apportioned to other policy holders of that class but for the fact that they have ceased to be members. We think that the concluding paragraph of the section now under consideration may be properly construed as conferring upon members the right at these quinquennial periods, if they so elect, to call upon the board to revise its previous rate of

assessment, and to reduce it somewhat so as to conform more nearly to the actual mortality experience of the company if it appears that the previous rate of assessment has been unnecessarily high, and has increased the reserve fund beyond the amount necessary for the protection of policy holders. We are unable to regard the provision as depriving the board of directors of the power to levy an assessment which they deem necessary, in the exercise of an honest judgment, to pay accrued death losses, and to maintain the reserve fund at a proper level. This power should reside in companies of the class to which the defendant belongs at all times. It is the basis upon which they are organized, and we are unable to hold that the defendant company intentionally devested itself of that power. Aside from this view of the case, we may repeat, what has heretofore been said, that the contemporaneous construction of the contract by the parties thereto is of the highest value in settling its true interpretation in those respects, where its construction is doubtful, and the evidence shows that the board of directors of the defendant company had constantly exercised the power of changing the rate of assessment, whenever they deemed it necessary to do so; and that this asserted right was not challenged by the deceased at any time during the 14 years that he remained a member. He may have been induced to become a member by the belief that he could obtain insurance on the co-operative and mutual plan at a much lower rate than in the old-line companies, who do business with the expectation of making a profit for their shareholders; and in this respect he does not seem to have been mistaken. He may also have expected to obtain insurance at a much lower rate than was in fact charged after his policy had been in force for several years and death losses became frequent. But it is quite evident, we think, that he fully understood and assented to the theory upon which the defendant proposed to conduct its business, namely, that those who became members must, in any event, pay the actual cost of insurance, whatever it might be, or retire from membership; and that the managing officers reserved to themselves, and would exercise, the power of making assessments from time to time for such amounts as they deemed necessary to pay accrued and accruing death losses, and at the same time maintain an adequate reserve or emergency fund. Our conclusion is, therefore, that mortuary call No. 96 was not invalid for the reason last assigned and considered.

The trial court, in directing a verdict for the defendant company, analyzed the testimony that had been introduced for the purpose of showing a waiver of the forfeiture which was incurred by reason of the nonpayment of mortuary call No. 96 on March 3, 1898, and, as the court's analysis of the evidence on that point is not criticised, we may well adopt it. From such analysis it appears that in the course of the 14 years which elapsed while the deceased remained a member his dues were paid on the day of maturity except on five occasions, and that in the meantime he paid something more than 70 assessments. The five assessments that were not paid on the precise day of maturity were paid on the next succeeding day with one exception, where the payment was made on the second succeed-

ing day; and in every instance but one a receipt was issued to the member, which specified that it was issued on the condition that he was then in good health, and that the receipt of the assessment on the day after it was due should not be regarded as a precedent for the receipt of future assessments after they were due; or, in other words, that it should not be regarded as a waiver of the provision requiring the payment of assessments on the day of maturity. The one payment that had been accepted after maturity, and was not accompanied by a receipt as last specified, was made in 1894, but thereafter all payments were made promptly, or the payments were accepted on the conditions last above stated. The trial court held that this did not establish a course of dealing from which it could be legitimately inferred that the defendant intended to waive the provision in its policies requiring payment of assessments on the day of maturity, or from which it could be inferred that it had consented that assessments might be paid subsequent to maturity without reference to the member's bodily condition. This ruling, we think, was clearly right, and the opposite view is not urged with much apparent confidence that it is tenable. From the course of dealing in question we think that no reasonable person could have been led to believe that a member of the company had the right to pay his assessments after as well as on the day of maturity. The company's conduct showed, as we think, conclusively that it intended to insist upon the stipulation that assessments should be paid punctually on the day of maturity, and that it would not vary therefrom, except as an act of grace, when the member was in good health. Counsel for the plaintiff in error complains of the introduction of the evidence of two witnesses showing what occurred between the deceased member and agents of the company when the former was asked to pay the last mortuary call and refused to do so, but, without reference to that evidence, which tended to show that he well understood that the failure to pay would result in a forfeiture, we think that there was no substantial evidence tending to establish a waiver. The result is that the judgment below must be affirmed, and it is so ordered.