TRISLER, Administrator of SCHMIDT, Appellant, v. MUTUAL RESERVE FUND LIFE ASSOCIATION, Respondent.

St. Louis Court of Appeals, December 17, 1907.

**LIFE INSURANCE:** Assessment Association: Readjustment of Assessments. Where the constitution and by-laws of a life insurance association upon the assessment plan empowered the board of directors to adjust calls and assessments, this authorized the board of directors to readjust the assessment upon members of the different classes, increasing the rate in an amount required to pay the cost of carrying the insurance of each class, taking into account the attained age instead of the entrance age of each member in one class in determining his assessment, and the fact that some classes were assessed upon the level plan and some were not, did not show an inequality in the assessment of the different classes nor make the association an ordinary life insurance company, there being no direct evidence that the readjustment discriminated against a member complaining of it.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough*, Judge. ·

AFFIRMED.

*Kinealy & Kinealy* for appellant.

(1) The policy is a Missouri contract to be construed by the law of Missouri. Cravens v. Insurance Co., 148 Mo. 583; Horten v. Insurance Co., 151 Mo. 604; Chemical Co. v. Railroad, 100 Mo. App. 164. (2) Plaintiff is not estopped to refuse payment of call 96 by

128 App.—32

reason of having paid illegal premiums under protest.
Life Assn. v. Kinter, 56 N. E. 966. (3) The policy and
papers given by defendant to plaintiff are "tricky and
deceptive," and even a very intelligent person would
consider them to mean that the rates would not be raised
during the life of the policy. Foster v. Life Assn., XX
Times Law Reports, 715 (House of Lords, July 29,
1904), in which one of the judges declared he would so
understand the policy. (4) Defendant had no authority
under the policy issued to plaintiff or its constitution
or by-laws in force when that policy was issued, or of
any lawful amendment thereof, to make call 96, or in-
itiate that system of insurance implied in the resolution
directing that call. Smith v. Knights of Pythias, 83
Mo. App. 512; Grand Lodge v. Sater, 44 Mo. App. 445;
Strauss v. Life Assn., 54 L. R. A. 608; Knights Templar
v. Jarman, 44 C. C. A. 93; Hale v. Union, 168 Pa. St.
377; Wist v. Grand Lodge, 22 Or. 271; Weiler v. Union,
92 Hun 277; Voigt v. Kerstein, 164 Ills. 314; Startling
v. Sup. Council, 108 Mich. 140. (5) An amendment
to the Constitution or by law could only be adopted by
a meeting of the members. 5 Am. & Eng. Ency. of Law
(2 Ed.), 89 and cases cited; Savings Assn. v. Nixon J.
P. Co., 25 Mo. App. 642; Watson v. Sidney F. W. P. Co.,
56 Mo. App. 145; Carroll v. Mullanphy Bk., 8 Mo. App.
249; People v. Throop, 12 Wend. (N. Y.) 183. (6) So
vital a change in the objects and practice of the defend-
ant could not be made at even an annual meeting of the
members without a special and full notice of the intend-
ed presentation of the resolution making it and of the
resolution itself, having been previously given. Bagley
v. Oil Co., 56 L. R. A. 184.

*Jones, Jones & Hocker* and *R. T. Railey* for respond-
ent; *Geo. Burnham, Jr.,* of counsel.

The defendant is an assessment association (as con-
tradistinguished from an old line level premium insur-

ance company) and the contract of the member author-
ized the levy of assessments for such amounts as were
necessary to pay its death losses.   Hanford v. Associa-
tion, 122 Mo. 50; Association v. Waddill, 138 Mo. 636;
Mutual Reserve v. Roth, 122 Fed. 853; Hayden v. Frank-
lin Life, 136 Fed. 285; Haydel v. Mutual Reserve, 98
Federal, 200; Crosby v. Mutual Reserve, 78 N. Y. Supp.
237; Westerman v. Sup. Lodge, 94 S. S. 482; Mutual
Reserve v. Taylor, 99 Va. 208; Mutual Reserve v. Fer-
renbach, 144 Fed. 342; Gaut v. Mutual Reserve, 121
Fed. 403; Reynolds v. Supreme Lodge, 78 N. E. 129.

STATEMENT.—Defendant is a New York corpora-
tion, chartered to do a life insurance business on the
assessment plan, and in 1885 was, and still is, licensed
to do business in this State.   On August 5, 1885, on the
application of Charles C. Schmidt, then fifty-nine years
of age, the association issued to him a certificate, in the
form of a policy of insurance, for $2,000, payable to
his legal representatives in ninety days after proof of
his death, provided said Schmidt kept the policy in force
by payment of stated annual dues and all mortuary as-
sessments made against him.   Schmidt paid his dues
and assessments to January, 1898, when call or assess-
ment, known as "Call 96" was made upon him for the
payment of $33.84.   This sum was largely in excess of
any previous assessment made on him and he refused
to pay it, and his policy was declared forfeited.   The
action was brought by Schmidt to recover the sum of
$1,201.95, the amount of dues and assessments paid by
him to the Association.   The right to recover is based
upon the allegation that Call No. 96 was not authorized,
was illegal, excessive, and that the cancellation of
Schmidt's policy was wrongful and unlawful.   Pending
the appeal, Schmidt died and the cause has been revived
in this court in the name of his administrator.
    The policy is as follows:

"In consideration of the application of this certificate of membership, which is hereby referred to and made a part of this contract and of each of the statements made therein, which whether written by his own hand or not, every person accepting or acquiring any interest in this contract hereby adopts as his own, admits to be material and warrants to be full and true, and to be the only statements upon which this contract is made; and in further consideration of the admission fee paid, and of the dues for expenses to be paid on or before the fifth day of August in every year during the continuance of this certificate, and of the further payment of all mortuary assessments, payable at the home office of the association in the city of New York, within thirty days from the first week day of the months of February, April, June, August, October and December of each and every year during the continuance of this certificate (or from such other periods as the board of directors may from time to time determine), and within thirty days from the day of the date that each assessment is ordered, the Mutual Reserve Fund Life Association, from and after the delivery hereof, with a receipt for the payment of the first annual dues, signed by the president, secretary or treasurer of the association, does hereby receive Charles Conrad Schmidt, of St. Louis, County of ————, State of Missouri, as a member of said association.

"Within ninety days after receipt of satisfactory evidence to the association of the death of the above named member, during the continuance of this certificate of membership, upon the following conditions, there shall be payable to the legal representatives of Charles Conrad Schmidt (self) of St. Louis, county of ————, State of Missouri, the sum of two thousand dollars from the death fund of the association, at the time of said death, or from any moneys that shall be realized to the said fund from the next assessment to be made as here-

inafter set forth and no claim shall be otherwise due or payable, except from the reserve fund as hereinafter provided.

"I. If, at such date as the board of directors of the association may from time to time fix or determine for making an assessment, the death fund is insufficient to meet existing claims by death, an assessment shall be made upon every member whose certificate is in force at the date of the last death assessed for, and said assessment shall be made at such rates, according to the age of each member, as may be established by the said assessment. (less twenty-five per cent to be set apart for the reserve fund) as provided in the constitution and by-laws of said association, shall go into the death fund.

"Il. The net earnings of the association, together with twenty-five per cent of said net receipts from each assessment shall constitute a 'Reserve Fund', which shall be deposited with a trust company, or companies, or departments constituted by governmental or legal authority, and upon the order of the board of directors of the association shall be securely invested in United States bonds, mortgages, or other interest bearing securities, for the exclusive benefit of the members of the association, and the interest on the same, as it accrues, shall be placed to the credit of the 'Death Fund', to be used in providing for the current death claims. The reserve fund above $100,000 and in excess of sums represented by outstanding bonds, may be applied to the payment of claims in excess of the American Experience Table of Mortality, and when any claim by death is due, after a mortuary assessment upon each member of the association has been made, according to the rules of the association, to making up any deficiency that may then exist in the death fund.

"III. After the expiration of each period of five years, during the continuance of this certificate of membership, a bond shall be issued for an equitable propor-

tion of the reserve fund, and the principal of said bond shall be available ten years from its date towards paying future dues and assessments under this certificate; and, should membership hereunder cease from any cause, said bond shall at once become null and void; and any portion of said principal not thus used, shall be applied to increase the bonds issued at the next quinquennial apportionment to other members of the association holding certificates issued during the same year as this certificate, and at each apportionment the rate of assessment may be changed to correspond with the actual mortality experience of the association."

The policy further provides that if such assessment be not paid within the time stated the certificate shall be null and void and all rights thereunder, including any moneys theretofore paid for assessments shall be forfeited to the association. The certificate also provides as follows:

"If at such date as the board of directors may from time to time fix or determine for making an assessment, the death fund is insufficient to meet existing claims by death, an assessment shall be made . . . , and such assessment shall be at such rates according to the age of each member as may be established."

And further provides:

"This contract shall be subject to all the provisions contained in the constitution and by-laws of this association, with the amendments made or that may hereafter be made thereto."

On the back of the policy, but not referred to therein, nor expressly made a part thereof, is indorsed what is designated as an "Assessment Rate Table," which contains a list of amounts opposite ages, beginning with fifteen years of age. Above this table is the following statement: "No assessment will be made while there remains in the death fund a sum sufficient to pay existing claims in full. The basis of the assessment rate for

each member according to the age taken at the nearest birthday for each $1,000 is as follows (here follows the list of amounts and ages above referred to)." Opposite age fifty-nine is the sum of $4.25.

Schmidt's application contains the following provisions:

"On the first week day of the months of February, April, June, August, October and December of each year (or at such other dates as the board of directors may, from time to time determine) an assessment shall be made upon the entire membership in force at the date of the last death of the admitted death claims prior thereto, for such a sum as the executive committee may deem sufficient to meet the existing claims by death, the same to be apportioned among the members, according to the age of each member;" and that said certificate is also issued and "accepted subject to the express condition that if any of the payments above stipulated shall not be paid on or before the day of the date as above provided, at the home office of the association in the city of New York, or to a collector of the association, furnished with a receipt signed by the president, secretary or treasurer, . . . then . . . the consideration of this contract shall be deemed to have failed and this certificate shall be null and void and all payments made thereon shall be forfeited to the association."

Defendant alleges that said application provides:

"And the applicant further agrees that . . . 'if he or his representatives shall omit or neglect to make any payment as required by the conditions of such certificate, or by the constitution and by-laws of said association, then the certificate to be issued hereon shall be null and void' . . . and all money 'paid thereon shall be forfeited to said association.' "

The certificate of insurance refers to the constitution and by-laws of the association and makes them a part of the contract of insurance. The following pro-

visions of the constitution and by-laws were in force at the date the policy was issued:

## "ARTICLE II.  BOARD OF DIRECTORS.

"Sec. 4.  The corporate powers of the association shall be vested in the board of directors, who shall have power to adopt such by-laws as they deem necessary, not inconsistent with this constitution, and to amend the same.  And to fix the amount and rate of assessments, fees and dues; and to enact rules and regulations for the government of officers and employees, and for the management of the affairs of the association."

## "ARTICLE V.  MORTUARY DEPARTMENT.

"Sec. 1.  The mortuary department shall be distinct from the other departments of the association, and all moneys received from the mortuary calls, less the cost of collecting, shall pass through said department and after deducting the expenses thereof, governmental taxes, legal and other expenses in defending or protecting the association against the payment of unaudited or fraudulent claims, shall be deposited by the treasurer in banks or trust companies, designated by the board of directors, to an account to be known as 'The mortuary account of the Mutual Reserve Fund Life Association,' and shall only be withdrawn from said account by transfer, on the order of the president and treasurer to the 'Reserve Fund,' or for investment in such securities as may be required by the laws relative to deposits to secure admission for the transaction of business by the asociation, as may be approved by the board of directors of the association, and which securities shall be deposited, as required by article X, sec. 2, of the constitution; or in settlement of death claims under the certificates of the association, said claims having been first approved by the executive committee of the association.

"Article X.

"Sec. 1.    Seventy-five per cent of all the net death assessments, as provided by article V, section 1, of the constitution, received by the association shall go into the death fund, from which losses shall be paid.    The remaining twenty-five per cent shall be carried to the reserve fund, no part of which shall be used for expenses.

"Sec. 2.    The net earnings of the association, together with twenty-five per cent of said net receipts from each assessment, shall constitute a 'Reserve Fund,' which shall be deposited with a trust company, or companies, or departments constituted by governmental or legal authority, and upon the order of the board of directors of the association shall be securely invested in United States bonds, mortgages, or other interest bearing securities, for the exclusive benefit of the members of the association, and the interest on the same, as it accrues, shall be placed to the credit of the 'Death Fund,' to be used in providing for the current death claims.

"Sec. 3.    The reserve fund above $100,000 and in excess of sums represented by outstanding bonds, may be applied to the payment of claims in excess of the American Experience Table of Mortality, and when any claim by death is due, after a mortuary assessment upon each member of the association has been made, according to the rules of the association, to making up any deficiency that may then exist in the death fund.

"Sec. 4.    After the expiration of each period of five years, during the continuance of a certificate of membership, a bond shall be issued for an equitable proportion of the reserve fund, and the principal of said bond shall be available ten years from its date towards paying future dues and assessments under said certificate; and should membership under said certificate cease from any cause, said bond shall at once become

null and void, and any portion of said principal not thus used shall be applied to increase the bonds issued at the next quinquennial apportionment to other members of the association holding certificates issued during the same year as the aforesaid certificate, and at which apportionment the rate of assessments may be changed to correspond with the actual mortality experience of the association.

"Sec. 5. On the first weekday of the months of February, April, June, August, October and December of each year (or at such other dates as the board of directors may, from time to time determine) an assessment shall be made upon the entire membership in force, at the date of the last death of the audited death claims prior thereto, for such a sum as the executive committee may deem sufficient to meet the existing claims by death, the same to be apportioned among the members, according to the age of each member.  .  .  .

"A failure to pay the assessment within thirty days from the first weekday of February, April, June, August, October and December (or within thirty days from the day of the date of such periods as may be named by the directors), shall forfeit his membership in this association, with all rights thereunder, and the certificate of membership shall be null and void."

In 1888 the by-laws were amended, and section 4, article 11, of the amended constitution reads as follows:

"After the expiration of each period of five years, during the continuance of a certificate of membership, a bond shall be issued for an equitable proportion of the reserve fund, and the principal of said bond shall be available ten years from its date towards paying future dues and assessments under said certificate; and should membership under said certificate cease from any cause, said bond shall at once become null and void, and any portion of said principal not thus used shall be applied to increase the bonds issued at the

next quinquennial apportionment to other members of the association holding certificates issued during the same year as the aforesaid certificate, and at which apportionment the rate of assessments may be changed to correspond with the actual mortality experience of the association."

At an adjourned meeting of the board of directors, held January 12, 1895, on recommendation of the actuary of the association, the following resolution, known as the "Shields Resolution," was adopted:

"*Be it Resolved,* That the rates of assessment for all members of this association admitted prior to January 1, 1890, be and the same hereby are reapportioned, in accordance with the table of assessment rates now in use, to rates indicated by adding to the age of entry, one-half the number of years from January first of the year of admission to January 1, 1895, fractions of years, resulting from the division to be counted as full years, and that said reapportioned rates of assessment, together with the present rates of assessments for all members admitted since December 31, 1889, constitute the rates of assessments of this association, beginning with Call No. 81, until otherwise ordered by this board; provided, however, that any increase beyond the rate indicated for more than seventy years may, at the member's option, be debited to his policy and deducted from the amount payable thereunder, instead of being paid in cash."

A table of rates was worked out under this resolution, and Schmidt was assessed $19.50 bimonthly, and paid these assessments under protest until Call No. 96 was made, in June, 1898. This call was made under resolutions of the board adopted at adjourned meetings held on September 18, 1895, and December 15, 1897. The resolution adopted September 18, 1895, is as follows:

"*Whereas,* There is and has been for a number of

years past, a table of assessment rates, regularly, and duly adopted by this board, and in use by this association, fixing and determining the rates of assessment at 'current' or 'attained' ages from the age of twenty-five (25) to the age of eighty (80) inclusive, both bi-monthly and annually which table is the table of assessment rates referred to in the resolution adopted by this board on the twelfth day of June, 1895, as 'The Table of Assessment Rates now in use,' and which was annexed to said resolution of June twelfth, 1895, and marked 'Exhibit A.'   Now, therefore, for the purpose of spreading said table of rates in full upon the minutes of this board, with a view of making a complete and permanent record thereof, it is hereby

"*Resolved,* That this board does hereby re-ratify, reconfirm, and readopt as the table of assessment rates now in use, and hereafter to be used, the table of assessment rates in the words and figures following, that is to say:

TABLE OF ASSESSMENT RATES.

"For case $1,000 of insurance (not including dues) at current ages.

| Age. | Bimonthly. | Annually. |
|---|---|---|
| 59 | 6.41 | 38.46 |
| | | |
| 71 | 16.92 | 101.52 |
| 72 | 18.47 | 110.82 |
| | | ." |

The following is the resolution adopted December 15, 1897.

"*Be it Resolved,* That pursuant to the terms of the contracts with the members, and in virtue of the power reserved to the association, for call No. 96, to issue and become payable February 1, 1898, and for all subsequent

calls until otherwise ordered by the board of directors, the rate of assessment for each member of this association holding a policy or policies upon the fifteen-year plan, shall be determined from the table of assessment rates now in use and upon the basis of the completed age in years of each member respectively, and of the amount of insurance by him carried at the date of each call."

Plaintiff was seventy-one years of age when call No. 96 was made, and his mortuary assessment was $16.92 on each thousand of his insurance.     In respect to this call, the actuary of the association testified the basis of the assessment was "on the table adopted in 1889, at attained age, as determined by the last birthday of each member," and said:    "I made an examination, as actuary of the association, of the entire membership of what was called the fifteen-year class (the earlier form of policy issued by the association) with regard to the payments that had been made on mortuary account, and of the benefits which had been received.    I found that the benefits to beneficiaries of these members, and the amounts that were outstanding to be paid on account of accrued, but not due claims, exceeded the entire mortuary payment that the members belonging to that class had made to the association from the beginning of the organization, by something over $800,000; that assessments levied upon the age and rate at which calls from Nos. 81 to 95, both inclusive, had been levied, would not produce a sufficient amount of money to meet existing death losses upon these members during the succeeding year, let alone the matter of meeting the accrued claims, and that, therefore, it was necessary for equity and justice, and the preservation of the institution, that those members should be brought up to attained age as a basis of their mortuary payments in order that they should meet the cost of the insurance they were receiving, as the other members of the associa-

tion were meeting the cost of the insurance they were receiving."

Schmidt received due notice of the call but refused to pay it and so wrote the association, claiming the call was unjust and accusing the officers of the association of rascality and fraud and, persisting in his refusal to pay, his policy was forfeited by the association.   He had received two bonds under section 4, article 11, of the amended by-laws, but they were forfeited with his policy.

Prior to January, 1895, the rate of assessment was determined by the age of the member at admission. After 1895, the age "for determining the rate to be levied against each member was made the attained age at one-half the distance between the age of entry and the first of January, 1895; that is, instead of determining the rate of assessment by the age attained, at original entry, as had been done, it was thereafter determined by the age attained one-half way between original entry and the first of January, 1895." The cost of insurance was arrived at "by determining the expected loss according to the American experience table of mortality, and determining the relation between that expected loss to the actual loss experienced by the association, . . based upon the calculation showing what the cost of the insurance to these members themselves was, and the income that was being derived from them, as based upon their then age in 1894." Members insured prior to 1900, were then classed as fifteen-year members.   Since 1895, the policies that have been issued "are in two general classes; one is known as the ten-year distribution policy, under which the first application of surplus accrues at the end of ten years— there being a rate of assessment which is expected to remain level during the ten years, and then increased at the end of ten years to attained age.   Then there is another class of policies known as the five-year class,

under which there is a higher rate of assessment, the payment of which is expected to remain level throughout life."

Under these classifications the assessments of members in the five-year class were fixed upon the experience of the association and the standard mortuary tables, with the expectation of running level throughout the life of the member and were intended to cover the cost of the insurance represented by this class of members. Members in the ten-year class were assessed in like manner, with the expectation that the level assessments would not be increased for ten years. At the end of each ten-year period, the assessments of this class were readjusted by the then attained age of each member, but the association, according to the testimony of the actuary, reserved the right to raise the assessments upon both of these classes, if it became necessary.

Clause 4, of the charter of the association, provides:

"The mode and manner in which the corporate powers granted are to be exercised are by issuing certificate of membership, policy or other evidence of interest to, and promise or agreement with its members, whereby upon the decease of a member, money, or other benefit, charity, relief, or aid is to be paid, provided, or rendered by said corporation or association to the legal representatives of such member, or to the beneficiary designated by such member, which money, benefit, charity, relief or aid are derived from voluntary donations, or from admission fees, dues and assessments, or some of them, collected or to be collected from the members thereof or members of a class therein, and interest and accretions thereon, or rebates from amounts payable to beneficiaries or heirs, and wherein the paying, providing or rendering of such money or other benefit, charity, relief or aid is conditioned upon the same being realized in the manner aforesaid and wherein the money

or other benefit, charity, relief or aid so realized is applied to the uses and purposes of said corporation or association, and the expenses of the management and prosecution of its said business."

The classification of members was made under this provision of the charter.

Schmidt offered in evidence a folder or card, which he testified was delivered to him by a soliciting agent of the association before he applied for insurance.     The language of this folder would induce any ordinary person to believe the rate of assessment would not be increased during the life of the policy.     This folder, however, was dated several years after the date of Schmidt's policy, and we must have been mistaken about the time when it was delivered to him.

The issues were submitted to the trial court sitting as a jury.     No declarations of law were asked or given. The court made a finding of the facts and then rendered judgment for defendant, from which Schmidt appealed.

BLAND, P. J. (after stating the facts).—1.     Resolutions under which the assessment were readjusted upon the basis of attained age, were not amendments of the by-laws, and for this reason plaintiff contends the assessments were unlawfully increased.     The constitution and by-laws of the association provide that the board of directors shall adjust calls or assessments, and in 1895, the board of directors adopted the policy of assessing each member on the basis of his attained age and expectancy of life, and authorized the executive committee to carry out the terms of the resolution. Under this resolution, each member was required to pay for his insurance in bimonthly payments the actual cost of carrying the same, according to the experience of the association, and this is denominated in the testimony of the actuary as an "equitable adjustment of the assessments," and also in the preamble of the resolution

of June 12, 1895.    This readjustment, according to the
evidence of the actuary, was recommended by the su-
perintendent of insurance of the State of New York, for
the reason, he claimed, that members in the fifteen-year
class were not paying for their insurance and were en-
joying an undue advantage over members in the ten and
five-year classes.    Both the by-laws and the certificate
of insurance authorized the board of directors to make
this adjustment.    Plaintiff's contention is, that while
members in the fifteen-year class are required to pay
assessments based on attained age, the ten and five-
year classes are only required to pay a flat bimonthly
premium or assessment, based on their age at the date
of entry, and that it is not expected that members of
these classes will be required to pay more than the flat
premium stated in their policies, at any time in the
future, irrespective of the age they may attain, and
that a division of the association's membership into
classes and the issuance of certificates upon  the  flat
premium plan largely increased the mortuary assess-
ments of members in the fifteen-year class from what
they would have been had not the classification been
made and certificates issued on a flat premium plan.
The evidence shows it was not expected that the assess-
ments of members in the five-year class would be raised
at any time during the life of their policies, and that
the level rate of the ten-year class only held good for
ten years and at the expiration of each period of ten
years another rate, based on attained age, would be as-
sessed.    These level rates, according to the evidence
are based on the experience of the association and the
standard mortuary tables, and cover the cost of the in-
surance to the association.    The evidence also shows
that Call No. 96 was calculated on the same basis.    In
other words, the evidence shows that under the read-
justment all members of the three different classes were

128 App.—33

required to pay assessments equal to the cost of carrying their insurance, according to the experience of the association, so there is no apparent inequality in the assessments upon the members of the three classes, nor does the contract with the ten and five-year classes to pay a level rate, with the right reserved in the association to increase these assessments, have the effect to designate the association an ordinary life insurance company. [Hayden v. Franklin Life Ins. Co., 136 Fed. 285.] The right of the association to make Call No. 96 has been before other courts and adjudicated in favor of the association. [Crosby v. Mutual Reserve Fund Life Association, 78 N. Y. Supp. 327; Haydel v. Id., 104 Fed. 718; Barbot v. Id., 100 Ga. 681; Mutual Reserve Fund Assn. v. Taylor, 99 Va. 208; Gaut v. Mutual Reserve Fund Life Assn., 121 Fed. 403.] The calls or mortuary assessments are periodically adjusted on the estimated cost of insurance according to the experience of the association, and is equalized among the members by taking into account the attained age of each member. It seems to us that this is equity and it certainly is authorized by the by-laws and constitution of the association, and expressly provided for in the contract of insurance itself. As opposed to this view, plaintiff cites the case of Strauss v. Mutual Reserve Fund Life Assn., 54 L. R. A. (N. C.) 605, where it was held that call No. 96 resulted in discrimination against members in the fifteen-year class, and was injurious. Strauss became a member in 1883. The terms of his contract of insurance are not stated in the opinion, nor are any of the facts upon which the court based its opinion. What is stated in the opinion is, that it clearly appears from the sixteenth, eighteenth, twenty-first and twenty-second findings of the facts there was discrimination and that plaintiff was injured thereby.

There is no direct evidence in the record before us

that Call No. 96 resulted in discrimination by which Schmidt was injured, nor can the inference, that the call resulted in such discrimination, be drawn from the evidence contained in the record; on the contrary, the evidence of the actuary, the only evidence on the subject, is to the effect that call No. 96 was the result of a readjustment of assessments, by which each member was required to pay his equitable part of the death fund; and the Strauss case is repudiated in Mutual Reserve Fund Life Assn. v. Ferrenbach, 144 Fed. 342.      Plaintiff also cites the case of Mutual Reserve Fund Life Insurance Co. v. Foster, 20 Times Law Reports 715 (decided by the House of Lords, July 29, 1904).     A letter had been written Foster and documents put into his hands by a solicitor of the association, and a table of bi-monthly rates, showing a minimum and maximum rate for each one hundred pounds of insurance, according to the age of each member, and a similar table was also indorsed on the back of his policy.     Under call No. 96, Foster was required to pay an assessment considerably in excess of the maximum rate as shown by the table indorsed on the back of his policy.     Under protest, he continued for sometime to pay the bi-monthly assessments under this call, and then sued the association to recover the excess he had paid above the maximum rate indorsed on the back of his policy. .   The Lord Chancellor said, there had been "great ingenuity in concealing the real effect of the contract, of insurance," and denominated the nature of the document tendered Foster as "tricky," and stated it was clear Foster did not understand the contract.     No letters were written to Schmidt, nor were any documents put into his hands by any agent or representative of the association before he made his application for insurance, and there was no indorsement on the back of his policy of the table of minimum and maximum rates.     The following only in respect to rates was indorsed on his policy:

"ASSESSMENT RATE TABLE.

"No assessments will be made while there remains in the death fund a sum sufficient to pay the existing claims in full.

"The basis of the assessment rate for each member, according to age, taken at the nearest birthday, on each $1000 is as follows:

"(Here follows table—the rates increasing with age.)    The rate opposite age 59 is $4.25."

There are, therefore, no facts to warrant us to denounce the transaction of the association with Schmidt as "tricky," unless it can be said that the policy, constitution and by-laws of the association are calculated to deceive.    We do not find them more complicated, more involved or more difficult to understand than are policies, constitutions and by-laws of most other associations of the same character.    The truth is, most life insurance policies are so written as to be incomprehensible to the ordinary man, and by such are taken upon trust, and if defendant's form of policy should be condemned as "tricky," to be consistent, we would have to condemn about every life insurance policy brought before us.    There is no evidence to satisfy us that call No. 96 violated the terms of Schmidt's policy, impaired its value or resulted in a discrimination to his injury, and for these reasons Smith v. Supreme Lodge K. of P., 83 Mo. App. 512, and other cases along the same line, cited by plaintiff, have no application to the facts in this case.    We agree with the following paragraph from the opinion of Judge Hough, before whom the case was tried:

"I further find that under the contract there was no limit upon the amount that could be assessed against the plaintiff's certificate, so long as the assessment was made to meet existing claims by death, and that the provision of said contract that assessments shall be made 'according to the age of each member' means the

age of the member when the assessment is levied. All of the evidence in the case indicates that at the time this assessment was levied the death fund of the defendant association was depleted and an assessment was necessary, in the judgment of the board of directors, and the assessment on plaintiff was made for such a sum as in their judgment was believed to be necessary to meet existing claims by death. Under these circumstances, although the assessment was larger than those theretofore levied against the plaintiff, yet as the amount of assessments to be levied was by the contract left to the discretion of the board of directors, and there is no proof that this discretion was abused, the assessment was a valid assessment and the non-payment of it on or before March 3, 1898, worked a forfeiture of the certificate."

The judgment is affirmed. All concur.