## GAUT et ux. v. MUTUAL RESERVE FUND LIFE ASS'N.

(Circuit Court, M. D. Tennessee. December 10, 1902.)

1. ASSESSMENT LIFE INSURANCE—CONTRACTS—POWER TO INCREASE ASSESSMENTS.
   Where the charter of a mutual assessment life insurance company gives it the power to change the rate or basis of assessments upon its policy holders from time to time, and its contracts do not prohibit such change, the fact that it changes its method and graduates its assessments according to the age of the policy holder when each assessment is made, instead of basing them on his age when the policy was issued, which was the method pursued for a number of years, does not entitle a policy holder to refuse to pay the same, and to recover damages for breach of contract, unless it is shown that the increase was fraudulent or unnecessary, although the change increased the assessments to such an extent as to render them prohibitive to persistent members.

At Law. Action for damages for breach of contract. On motion of defendant for direction of verdict.

The following is a copy of the plaintiffs' declaration, with the exhibits attached thereto:

The plaintiffs sue the defendant, a corporation existing under the laws of the state of New York, but doing business in the state of Tennessee under its laws, upon the following cause of action:

On the 12th day of August, 1885, defendant entered into a contract with plaintiff J. H. Gaut to insure his life for the sum of $5,000 on the co-operative or installment plan, and executed and delivered to him its policy of insurance, or certificate of membership. whereby it agreed to pay said sum to plaintiff Ella L. Gaut, should she be living at the time of his death, and, if not, to pay the same to his legal representatives. Said payment was to

be made within 90 days after the receipt of satisfactory evidence of his death, during the continuance of said certificate. Said policy of insurance or certificate is here to the court shown, and made part of this declaration. The consideration of said agreement was the promise upon the part of said J. H. Gaut to pay an admission fee of $20, which he did, and to pay $10 annual dues on the 12th day of August of each year, and to further pay all mortuary assessments within 30 days from the first week day of the months of February, April, June, August, October, and December of each and every year during the continuance of this certificate. It was further provided in said certificate that, if at such date fixed for making an assessment the death fund was insufficient to meet existing claims by death, an assessment should then be made "upon every member whose certificate is in force at the date of the last death assessed for, and said assessment shall be made at such rates, according to the age of each member, as may be established by the said Board of Directors." In said certificate it is further provided that "this contract * * * shall be subject to all the provisions and conditions contained in the constitution and by-laws of this association, with the amendments made, and that may hereafter be made, thereto": "the entire contract contained in this certificate and said application, taken together, shall be governed by, and subject to, and construed only according to the constitution, by-laws, and regulations of said association, and the laws of the state of New York, the place of this contract being expressly agreed to be the home office of said association in the City of New York." Defendant was organized under a general statute of the state of New York, passed in the year 1883 (being chapter 175 of the statutes of that year): "The corporators, trustees, directors, members, members or representatives, as the case may be," were by said act empowered "to make such by-laws as may be deemed necessary for the government of its officers and the conduct of its affairs, and the same, when necessary, to alter and amend." Said statute contains no provision authorizing the adoption of a constitution, rules or regulations. Under said act, in the year 1885, defendant undertook to adopt a constitution, as well as by-laws. Article 10, § 5, of the constitution, provided for the levying of bimonthly assessments "upon the entire membership in force at the date of the last death, * * * the same to be apportioned among the members according to the age of each member." Defendant's constitution, by-laws, rules, and regulations, as they existed on the 12th day of August, 1885, when said certificate was issued, contained no provision other than the one quoted above, determining the basis on which assessments should be made; and hence said certificate and said constitution, if valid, constituted the entire contract as to said basis. The proportion of each assessment to be paid by members of different ages, as fixed by said contract, is set forth on the back of said certificate. The amount fixed by defendant to be paid by plaintiff J. H. Gaut on mortuary call No. 22 (the first call after the date of the certificate) was $25. He paid this and all other assessments as made, down to and including assessment No. 95 (the latter paid on the 29th day of December, 1897), amounting in all to $4,020.45. He also paid the annual dues beginning August 12, 1885, and ending August 13, 1897, 13 years, at $10 per year, making $130. He paid the entrance fee of $20 making a total payment to December 29, 1897, $4,170.45. On the 12th day of June, 1895, defendant's board of directors undertook to pass a resolution, copy of which is here to the court shown, marked "Exhibit No. 1," and made part of the declaration. By said resolution the attempt was made to constitute a separate class of the members admitted prior to January 1, 1890, and assess them, not on the basis of their age at date of entry, but on the basis of that age with the addition of one-half the number of years which elapsed from January 1 of the year of admission to January 1, 1890, while other members continued to be assessed on the basis of their age at the date of entry. Said board also undertook to fix the rate upon the class mentioned at an amount sufficient to meet all the death losses in the class, without the aid of assessments on the members outside of that class. On the 12th day of December, 1897, defendant's board of directors undertook to pass a resolution, copy of which is annexed hereto, marked "Exhibit No. 2," and made part of this declaration, whereby it was

resolved that all members of said class, which are termed "members holding a policy upon the 15 years plan," should be assessed upon the basis of their ages at the time of the various assessments, instead of upon their ages at date of entry, or the ages fixed by the resolution of June 12, 1895; all other members continuing to be assessed upon the basis of age at date of entry. Plaintiffs aver that defendant had no power, under its charter and contract with plaintiffs, by amendment of its constitution or by-laws, or otherwise, to so change the contract; and they aver further that no attempt was ever made to so change it, by such amendment or amendments or otherwise, except by said resolutions. Plaintiffs aver that there is no provision in defendant charter, constitution, by-laws, rules, or regulations for any amendment thereof which empowered said board to change the basis of assessments, or to discriminate in any way between members holding old certificates and those holding new ones, and said action was in violation of said contract and contrary to law. In the year 1892 the Legislature of the state of New York passed an act making it a misdemeanor for "any insurance company or officer, or agent thereof," to make any discrimination in favor of individuals of the same class, or of the same expectation of life; and the Legislature of the state of Tennessee in 1897 (chapter 127, § 8), passed an act of substantially the same import. On February 1, 1898, defendant notified plaintiff J. H. Gaut that an assessment or mortuary call of $100.20 (being No. 96) had been made upon him, payable March 3, 1898, which he paid in due time, under protest, making the total payment, exclusive of interest, $4,270.65. On the 1st day of April, 1898, he was notified of another assessment of the same amount (No. 97), payable May 2, 1898, which he refused to pay. On the back of said notices was printed a schedule of rates, showing that plaintiff's bi-monthly assessments for the seven years following would be, per year, as follows, on a $5,000 policy:

| | | |
|---|---|---|
| 74 years of age..........$652 80 | 78 years of age..........$ 936 30 |
| 75 " " " .......... 707 70 | 79 " " " .......... 988 70 |
| 76 " " " .......... 766 50 | 80 " " " .......... 1,083 60 |
| 77 " " " .......... 833 10 | |

Said certificate provides that, if any assessment is not paid on or before the date fixed for the payment thereof, the contract shall be deemed to have failed, and the certificate "shall be null and void." Defendant undertook to declare plaintiff in default, and canceled his policy or certificate, because of his failure to pay said illegal call. Plaintiff J. H. Gaut was at that time, viz., on the 2d day of May, 1898, about 73 years of age,—8 years above the insurable age in defendant's company, and above the insurable age in any reliable insurance company,—and was in impaired health. Defendant's reserve fund, according to its own representations, amounted in 1898, and still, to over three millions of dollars. Defendant has violated its contract with plaintiffs, and has collected illegal and excessive assessments from plaintiff J. H. Gaut; has rendered it impossible to carry out its contract with plaintiffs; has ceased to recognize plaintiffs, or either of them, as members or policy holders; and has canceled and declared null and void their certificate or policy, to plaintiffs' damage five thousand dollars; and hence they sue.

Exhibit No. 1.

Resolution of June 12, 1895.

Resolved, that the rates of assessment for all members of this association, admitted prior to Jan. 1, 1890, be, and the same hereby are, reapportioned in accordance with the table of assessment rates now in use, to rates indicated by adding to the age of entry, one-half in number of years from Jan. 1st of the year of admission to Jan. 1, 1895, fractions of years resulting from the division to be counted as full years, and that said reapportionment rates of assessments, together with the present rates of assessment for all members admitted since Dec. 31, 1899, continue the rates of assessment of this association, beginning with call No. 81 until otherwise ordered by this Board, provided, however, that any increase beyond the rate indicated for more than 70 yrs., may, at the member's option, be debited to his policy, and deducted from the amount payable thereunder, instead of being paid in cash.

Exhibit No. 2.

Resolution of December 15, 1897.

Resolved, that pursuant to the terms of the contract with the members, and in virtue of the power reserved to the association, for call No. 96, to issue and become payable Feb. 1, 1889, and for all subsequent calls until otherwise ordered by the Board of Directors the rate of assessment to each member of this association, holding a policy or policies upon the 15-year plan, shall be determined from the table, and of assessment rates now in use, and under which said policy have hitherto been assessed, and upon the basis of the completed age in years of each member respectively, and of the amount of insurance by him carried at the rate of each call.

To this declaration defendant filed pleas of the general issue, and alleging that the policy was canceled for nonpayment of assessments in accordance with the terms of the contract.

J. M. Gaut, for plaintiffs.

T. B. Turley, H. A. Chambers, George Burnham, Jr., and S. T. Tyng, for defendant.

HAMMOND, J. It is the opinion of the court that the motion of the defendant to direct a verdict in its favor should be granted, and the verdict will be so entered. I might now close the case, and leave the question where the law puts it; but it would be intolerable to counsel on either side, and to you, that I should make no explanation for taking that course. But what I am saying is not a charge upon which any exceptions can be taken, or of which any error can be predicated, as I am simply explaining to you the reasons why I direct your verdict in favor of the defendant, for your own information, and as a matter of courtesy to you and counsel.

I only wish I had time to take this record out, and go quite carefully over the details of it, in order to fully justify that judgment; but that is a matter of impossibility, under the circumstances under which we are trying this case here and now. But I may say to you that when the plan of assessment assurance was first commenced among our people and those of England, where it has obtained for some time, it was denied by the writers upon the subject, and those who are familiar with the philosophy and science of insurance, that it was a practicable and workable scheme of insurance; and it was attacked from the beginning as being an absurd system, as being one that would result just as this policy has resulted, and for just the very reasons that have been given here in reference to the outcome of it to this disappointed plaintiff. Originally the same objections were urged against assessment insurance as those which we find exhibited by the facts of this case and to considering it a desirable or effective plan or means of accomplishing the purpose of life insurance. That controversy and conflict among those who know something of the scientific values of plans of life insurance has been raging ever since. The assessment plan was a very attractive system, and, if it could be worked, it would undoubtedly be more attractive than other forms of insurance which are regarded as more

excellent and efficient. Its cheapness was its chief value, and there were such other attractive features that the benefit societies based on that plan, and the mutual insurance companies using the same plan, had an immense rush of business,—a kind of boom or craze for that sort of insurance, which is a familiar fact in the history of life insurance. It was seen in the beginning, in the first years of the scheme, that it worked out very well; that it was very attractive and very satisfactory; but as the company grew, and the average of the generations of human life, somewhere in the neighborhood of 30 or 35 years, approached, it was realized that a constantly increasing death rate would become so enormously large that the cost of insurance in the end would be disastrous. I speak with some reserve as to the history of it, but my recollection is that the history of assessment insurance in this country and in England has pretty well justified what was said of it in the beginning. Some of the societies and companies have gone into the hands of receivers to wind up, and lost everything for every one that went into it. Some of the old-line companies, it is true, have done the same thing. But all these assessment companies have got into trouble, and they have all been doing everything and struggling in every way they could devise to save themselves against this defect that existed, but was not fully appreciated, in the start. We have a very significant indication of that fact in the proof here that this defendant company has changed or attempted to change its policy, and convert itself into an old-line company. Nevertheless, it had this large body of persons insured on the assessment plan, and had to take care of them; and it felt that it must do what they were authorized to do to meet and provide for and against the losses to which I have called your attention. Theoretically a great deal could be planned about it. For instance, it was believed and said that new blood could be brought into it; but, when the people already insured got to be old, the young men on the outside would say: "It is not worth while for us to go into this class of old people ready to die, for we will go in only to carry their insurance, and so we will keep out." Therefore new blood did not come in, and there is the inherent defect. The idea that the scheme would be worked out by an influx of new and young people has been a disappointment.

Now, that is what has happened to Mr. Gaut, the plaintiff, in this case. He has been bitterly disappointed in the outcome, no doubt; but that does not give him a right to recover the money he paid into this company—one which he selected on account of its attractiveness; and this misfortune of his cannot give him a right to get back money which voluntarily he paid into an ill-devised scheme of insurance. The only thing he can do, or has a right to do, is to recover any damages that may have accrued to him by reason of the company's violation of their contract, and hence he says that which has been done under the contract is a violation of it, and is illegal. The court does not think so. The court does not think there is any illegality in the procedure or practices of this company, as shown by the proof, in making these assessments. Undoubtedly it started out with the idea it would apportion the assessments from

time to time, according to the age of the member at the time that he entered the company, and to that extent the company has undoubtedly given a practical construction to the contract; but, after all, it was not so much a matter of construction of the contract, as it was a selected method of doing the business of raising funds to meet losses by making assessments. All started out with the idea that they could keep the assessments down to something like the amount that was originally required to pay losses by the influxion of new blood, as just explained, and at the same time they hoped to keep to the analogies of old line companies of a fixed premium at the entrance age; but, when the company was disappointed about that, as was Mr. Gaut, evidently it had to resort to some kind of a scheme or plan, within its chartered powers and within its contracts, to save the company, and those connected with it, from loss. Whether, in what this company did, it acted wisely or unwisely, we are not here to inquire. Every man who goes into a company submits himself to the wisdom of those governing it—the board of directors or the stockholders, or to whomsoever is appointed to govern the corporation; and everything they do unwisely is not necessarily a matter of just complaint or cause or ground of damages to the members, because they must submit to the discretion of somebody, and the policy holders of this company submitted to the board of directors the problem of doing the best they could to get out of this inadequacy of funds to pay the death losses. The directors in this case resorted to what all the companies usually and principally do. They increased the assessments. Mr. Gaut, the plaintiff's counsel, does not deny, on the part of the plaintiff, that they had a right to increase the assessments. He says they have not increased them according to the original scheme and plan, and according to their experience with the actual results of the scheme, as they were bound to do. But we have no proof here showing that this company has not assessed the losses or premiums upon their actual experience as they found it in the operation of the company. If Mr. Gaut could show by a bill in equity, or in this action in law, that the company, in the process of assessing these premiums, had assessed the plaintiff in this case a larger sum than their experience in the management of the company's business actually necessitated, and more than the actual requirements under their scheme of insurance demanded, then he would have a good cause of action; but he has not gone into that; has not gone to New York and examined the books of this company, or otherwise shown how many deaths there were, and how many losses, and the amount, and how many assessments were necessary to be made, and what amount each member should pay, and thus enable the jury—if they could practically make such an inquiry as that—to determine that the payments demanded of the plaintiff were too large; but he has not brought such evidence as that before us, and has rested on the fact that the plaintiff in this case has been required to pay in a larger sum of money than is agreeable to him, and a larger sum of money than would be justified by good business considerations in paying for life insurance. That may be so, and greatly disappointing to him, and, no doubt, it is; but it is not shown to have come from any wrongdoing on

the part of the company, and therefore we cannot give him any judgment on that ground.

Now, as to the rates of insurance. The taproot of this whole controversy is that Mr. Gaut claims that by this contract he had secured to himself the right to have, during all his lifetime or during the continuance of this policy, assessments made against him as of the age of 61, when he entered the company, and not as of any advanced age, and that when the company came, according to its experience and necessities, to assess any needed sum upon all members of the company, it must assess his share as of the age of 61, and not at his then attained age. The court does not think that is one of the stipulations of this policy. He has not been accorded by the charter the right to demand that method and rate of assessment, if you call it so, or ratio of assessment. He has not had secured to him, by any expressed words of the contract, the right to have any assessment made as of the age of 61. It is true that this company assessed him at that age for 12 years, but it was its right to do that, and then to abandon that method at any time. It was not a construction by the company of their contract with the plaintiff; but it was a method chosen, by which the company hoped to make its business attractive, and so attractive that it might last as a rule of assessment always, no doubt; but when the time came that it was confronted with changed conditions, and confronted with the fact that it did not have enough money to pay constantly increasing losses, it was within the province of their contract, and strictly within its provisions, and wholly within the competency of the charter, for the company to devise a means by which these assessments could be increased; and then, likewise, under the terms of the contract and the charter, it was permissible to have changed the method or proportion of assessments from the age of entry to the age attained at the time the assessment was made. I think there is no doubt but that that construction of the contract and the charter is correct, and, this being so, to thus make the assessments would not violate the contract. As to whether that change was wise or not, it is not for us to say. There is nothing here to show it was fraudulently done; nothing to show it was unnecessarily done; nothing even to show that it could have been done in some way that would have been better; and we must take it, in the absence of such proof as that, and assume it to be true, that the company did the best its judgment dictated: and this plaintiff cannot complain if the company was acting within the exercise of its charter powers and rights, and within the terms of the contract, no matter how disastrous the change was to him at his greatly advanced age. He has outlived the value of his insurance on the plan which, unfortunately, he selected when he was younger.

The next question is whether it is an excessive assessment. If that were so, he might refuse to pay the premium, and recover the money back, but it has not been shown that it was excessive. How can we say it was excessive, unless we know all the facts of the assessment No. 97 which he refused to pay? It is true, we can see that it is high, and quite prohibitive to continuance in the company

for a member who is called in the proof "a persistent member"—that is, one who keeps up his policy, keeps on paying his premiums, instead of forfeiting those already paid and getting out of the way; and the question was, "How much shall we assess this member as he grows old?" That which they did may indicate a harsh mode of dealing with a "persistent member," but unless we have an insight into the true condition of the company's operations, and go into the vitals of it, and see how it was constituted, and what was the basis of it, no matter how good may be our business capacity, we could not tell whether the assessment made was an excessive assessment or not. That the plan of assessing according to the age attained at the time of making the assessment is burdensome to the oldest men goes without saying, and also that it increases the burden of all members with advancing age. But that fact, or the fact that it was burdensome to Mr. Gaut, would not show it was excessive, and that is all he has to rely upon. It may be that the burden and absurdity come from the absurdity of the insurance itself—from the natural infirmity in the scheme of assessment insurance; and the plaintiff cannot recover until he goes further, and shows by some proof, brought before us, that it was outside and beyond the necessities of the company, which he has not shown.

Another complaint is that the plaintiff has been wronged, and his contract violated, in the manner in which the company has treated its reserve fund. I do not see any proof of that. So far as we have any proof, it rather shows to the contrary, but we are not sufficiently advised by the proof to say, as to the reserve fund, just what the scheme was; but, as far as Mr. Gaut was concerned, he had a provision in his contract relating to that reserve fund, or to his share of it, and he got the two bonds to which he was entitled, and used them; and the testimony of the witnesses of the company is that it would have gone on and delivered to him whatever bonds he was entitled to under the contract, if he had continued his insurance. It was a bond which assigned to him his share of the reserve fund, and which he might use or make available to that amount on certain conditions mentioned in the bond. He got that benefit for some time. It is not necessary to say how much, but he certainly got two bonds, and some part of them was used by him. There is no proof to show he was entitled, under this new scheme of assessments, to any more of the reserve fund, or that he was in any way injured by the company's treatment of that fund. There were to be new issues of bonds on plans of five and ten year series. Also there were made some different arrangements about the process of distributing this reserve fund, than that Mr. Gaut had; but until he has shown by the proof that these differences in arrangement, whatever they were, resulted in some denial to him of his right or share in the reserve fund, he has no right to complain.

Another complaint suggested is that the company might have paid some of its losses out of the reserve fund, under the terms of his contract, but I do not see that that has been established by the proof. We cannot say by any proof before us that in 1898, or at any time,

there was a condition existing as to the reserve fund which enabled the company to exonerate the plaintiff from any of the burdens of this policy of insurance by paying death losses out of· the reserve fund; and until the plaintiff has shown us, by sufficient proof, and by examining the operations of the company in its details, such a result as that, we cannot see how he could have a right to recover.

The outcome of it all is that the plaintiff relies upon the fact that this company has assessed him at the rate of 73 years instead of at 61, which it had done for 12 or 15 years after his insurance commenced. Unfair as that may have been to Mr. Gaut, burdensome and a hardship as it was, it was a right that the company had, to assess him that way, under the charter and the contract; and having that right, and not having shown that the company violated its discretion or judgment in the premises, I do not see how he has any cause of action because of the hardship. The law does not relieve against hardships of that kind in the bargains that are made by the parties to the contract.

There are judicial decisions that have been read in our hearing, on both sides of the question, as to the proper construction of the charter of this company and the contracts of insurance under it; but, until it is settled by the Supreme Court, there will be differences of opinions, for judges differ like other people. There seems to have been in Virginia and Georgia and in New York one view, and in North Carolina and Minnesota another. The opinion in North Carolina is a very strong opinion, and possibly is the sound one, but I do not think so. It proceeds upon the theory that this company and Gaut had made a contract which forbade the company to make any assessment other than at the age of entry into the company; but, from what I have said, you will understand that I do not concur in that view, but agree with the Court of Appeals in the Eighth Circuit that the company had abundant power under its charter and under the plaintiff's contract to do what it did do, and that it was bound to do what was required to raise the funds for its losses according to the circumstances of its operations and the necessities that ·confronted it, and that these requirements of the company were to be met as it appeared best to them at the time they arose; and we do not see, from any proof we have here, that the company violated that duty; and I feel compelled to say, notwithstanding the loss to Mr. Gaut, that he has not shown such a case as would authorize us to give him a verdict upon any showing he has made in that behalf.

Mr. Gaut, of course you desire to take an exception. It is not required that you should take any exception to the language of the court in giving its reasons for directing a verdict, for that is unnecessary. The stenographer will enter on the record an exception on the part of Mr. Gaut to the court's action in directing a verdict in this case for the defendant.