[No. 12583.  Department One.  June 3, 1915.]

JESSE THOMAS, *Respondent*, v. THE KNIGHTS OF THE
MACCABEES OF THE WORLD, *Appellant*.[1]

INSURANCE—MUTUAL BENEFIT INSURANCE—RIGHT OF CERTIFICATE
HOLDER.  A certificate of membership in a fraternal beneficiary so-
ciety assuring the payment of a benefit on the death of a member is
not a contract in the commercial sense, but a mutual promise of
every member to pay the certificate of every other member; hence
there is no vested right in any provision of the contract, either ex-
press or implied, that is not subject to and controlled by the duty
of the member to pay the cost of his own insurance, for under no
construction of a mutual contract can he demand more than he is
willing to give.

SAME — MUTUAL  BENEFIT  INSURANCE — RIGHT  OF  CERTIFICATE
HOLDER.  An agreement made by a member of a fraternal beneficiary
society, when accepting his certificate, to abide by all the laws, rules
and regulations of the society that may have been or might there-
after be passed, binds him to observe such legislation as is calculated
to insure a rate sufficiently adequate to pay the cost of his own in-
surance; hence the action of the society in raising the assessment
rate subsequent to the issuance of his benefit certificate based on a
lesser rate, on a finding of necessity therefor by the legislative
authorities of the society, cannot be objected to by the member as
a violation of his contract.

SAME—INCREASE OF RATES—ESTOPPEL.  The issuance and accept-
ance of a benefit certificate in a mutual fraternal society not being
in the strict sense a contract, the doctrine of estoppel cannot be in-
voked against the society's increasing its assessment rates, by reason
of the complaining party having been lured into joining by the
provisions of its by-law fixing rates, the speeches of supreme officers,
or other matters in the nature of estoppel.

SAME—CONTRACTS—VESTED RIGHTS.  There is no vested right in
having a benefit certificate of a mutual fraternal society remain un-
changed, for the reason that there can be no vested right in such
contract so long as a duty to the other contracting parties rests
upon the one asserting it and his duty is unperformed; hence, a
member of a mutual insurance society has no right to insist that it
continue to do business upon an unsound basis for his individual
benefit.

[1]Reported in 149 Pac. 7.

SAME—INCREASE OF ASSESSMENTS. Where the old plan of assessment for a mutual insurance society proves a failure, and a readjustment of the rates charged is necessary so as to make the basis therefor conform to the cost of insurance according to the age of members, the fact that the burden of meeting the alleged deficiency in rates is cast upon those who have attained the age of fifty years or more, while the increase was not made applicable to the younger class of members, is not the fixing of an arbitrary age and producing a class distinction, since it is made in conformity to the law of experience in such matters.

SAME—DEPRIVATION OF MEMBERSHIP—INCREASE OF RATES. The fact that a member of a fraternal beneficiary society will be turned out and thus lose all fraternal features of the society is no ground for defeating an increase in the rate of assessment, when that is found necessary to the continued life of the institution.

SAME—AMENDMENT OF BY-LAWS. The fact that the rate of assessment on members of a mutual insurance society was fixed in a by-law at the time he entered the society, would not preclude the society from subsequently changing that, as well as any other, by-law, when the power of amendment is reserved as to all by-laws, and a condition attached to the issuance of the benefit certificate was a compliance with the laws in force or thereafter adopted.

SAME—RIGHT OF CERTIFICATE HOLDER. Where a member of a fraternal beneficiary society agreed, in accepting a benefit certificate, that the society might levy any number of assessments necessary to pay death losses, the imposition of increased rates distributing such payments over a number of years, instead of making more frequent assessments, cannot be regarded as a violation of a contract limiting his assessments to the rate fixed at the time of entering the society.

SAME—SURPLUS. The fact that there is money in the treasury of a mutual insurance society to be devoted to the payment of death benefits is not always a surplus or reserve nor does it necessarily show the lack of necessity for an increase in assessment rates, when in fact such sum is inadequate to meet payment of the death claims to which the society is actually pledged.

SAME—RESCISSION OF CONTRACT. A member of a fraternal beneficiary society whose assessment rate has been increased for the purpose of enabling the society to adequately perform its functions cannot rescind his contract and recover the dues and assessments paid by him; since the society has not thereby repudiated the contract, but is endeavoring to perform it, and he cannot complain so long as he has had protection for less than cost.

SAME—INCREASE OF ASSESSMENTS. The increased rate for assessments affected by a fraternal benefit society being in conformity to the mortuary tables established by the National Fraternal Congress, as is required by the laws of this state, which become a part of every contract of insurance written herein, a member cannot complain of such action, though burdensome to him individually.

COSTS—APPEAL—AWARD TO UNSUCCESSFUL PARTY. The allowance of costs in a suit in equity being a matter within the discretion of the court, on reversing an appeal, it is proper to award costs against the appellant, where the case is a test one and has an importance to the appellant aside from the reversal of the case at issue, as it affects every member of it.

Appeal from a judgment of the superior court for Pierce county, Clifford, J., entered April 4, 1914, upon findings in favor of the plaintiff, in an action to enjoin the collection of an assessment levied by a fraternal benefit association, tried to the court. Reversed.

*Reynolds, Ballinger & Hutson* and *Carlos S. Hardy*, for appellant.

*Jesse Thomas, in propria persona.*
*George W. Miller, amicus curiae.*

CHADWICK, J.—Jesse Thomas, respondent, then thirty-eight years old, applied for and received a certificate of membership in the appellant order, a fraternal beneficiary association organized under the laws of the state of Michigan. The society was organized, and commenced to do business as such, in the year 1883. It is what is popularly known as a fraternal benefit association, having no other object than to promote social and fraternal intercourse among its members and to pay benefits in case of sickness or death. It is carried on by a lodge system having a secret ritual. It adopted and has maintained a representative form of government. Its subordinate or local bodies are called "Tents." A state body, known as the "Great Camp," is made up of delegates elected by the "Tents." The Great Camp in turn elects delegates to a national council or assembly known as "The Su-

preme Tent." Each of these bodies have legislative powers, the Supreme Tent having a general revisory power over the acts of all subordinate bodies, as well as jurisdiction to make all changes in the substantive law of the order which .in its judgment may be necessary for its preservation and well being. At the time it was organized, the society adopted a schedule of rates to be collected by assessment upon the membership, the fundamental thought being that the society would make an assessment upon the membership to meet each death loss as it occurred, and *"in case one assessment per month shall not be sufficient to pay the death and disability claims as they occur, then the supreme record keeper is hereby authorized to levy such additional assessments as may be required from time to time to pay such claims."*

There seems to have been an assumption that it would not be necessary to levy more than twelve assessments per annum to meet the maturing obligations of the society. In the first three years of its existence only eighteen assessments were levied. Thereafter assessments were levied with greater frequency, so that, notwithstanding an increase in rates, for example, from 60c per thousand at the time of organization (1883) for age thirty-eight, to 90c per thousand (1895) for the same age, the society was compelled from time to time to levy what is commonly known among fraternal insurance societies as "double headers," that is, two assessments at the same time.

Mr. Thomas joined the society in 1896. His rate was 90c per one thousand dollars. The increased rates did not apply to members who had joined before they were adopted. The resources of the society, if that term is proper, seemed to be still inadequate to meet its obligations. The Supreme Tent, through its officers and members, and through a commission aided by the advice of an actuary who is said to be an expert in the line of insurance, investigated its affairs. Without going into their findings in detail, it will be enough to say that they found that there were 234,000 members, with

benefit certificates aggregating $375,599,000, with accumulated funds, or so-called reserve, of $1,950,303. The commission also found and put into figures what the experience of the society had made manifest, that the original rates were wholly inadequate to mature the outstanding certificates at twelve assessments per year. It found that, although the then face value of the outstanding certificates was $375,599,000, the real value was not more than $123,597,104, and that the amount to be paid by the members (upon a basis of twelve assessments per year covering the term of their expectancy) to meet this insurance was $58,735,995, leaving a deficiency of $64,861,109. Or, to state it in another way, the members, not having met the current cost of their insurance, must (if their certificates were to be matured, not of those who may die first, but the last as well as the first) adopt some plan to meet this deficiency, either by the accumulation of a reserve of $64,861,109, or to so increase the rates as to make each member meet the future current cost of his own risk.

It would seem that the first plan was manifestly not feasible. The Supreme Tent adopted the only other alternative, that is, a general increase of rates. These were adopted at the session of 1904. We shall refer to them only in so far as they affect Mr. Thomas. The rate for age thirty-eight was increased to $1.65 per thousand for each assessment. Respondent was given an option to re-rate and carry his certificate, without medical examination, at that rate at his attained age of forty-six years. This he did not do. Had respondent done so, his monthly assessment would have been $1.65. In all other respects his certificate would have been as before. It was also provided that all members who did not elect to re-rate and who should thereafter attain the age of fifty-five should pay an assessment of $3 per month. Not having elected to re-rate in 1904 at his attained age of forty-six at the rate of $1.65, respondent was notified, when he had attained the age of fifty-five (1913), that he would thereafter be required to pay assessments at the rate of $3 per

month. He began this suit to enjoin the collection of the new rate, or, in the alternative, if the court could not enjoin the new rate, he asks that the contract be rescinded as for fraud, and that he recover all sums theretofore paid to the society. From a decree enjoining the collection of the new rate, the society has appealed.

Respondent rests his case solely upon his contract. He says: "Fortunately the questions involved are few and simple, not going beyond the elementary law of contracts." The contract calls for a whole life certificate with certain endowment features after seventy years, at an assessment rate per $1,000 of 90c. The society had adopted and published a constitution and by-laws in which the rates were published. A copy had been put into respondent's hands at the time his membership was solicited. The section fixing rates provides, among other things, that "He [the member] shall pay the same rate of assessment thereafter so long as he remains continually in good standing in the order." It is contended that this provision in the general law of the society entered into and became a part of the contract, and is in terms a specific assurance or guaranty that the rates will not be raised in the future, and because of its mention of rates, it will not be overcome by a so-called general provision on the face of the certificate that the member "will comply with the laws of the order now in force or that may hereafter be adopted."

It was so held in *Wright v. Knights of Maccabees of the World*, 196 N. Y. 391, 89 N. E. 1078, 134 Am. St. 838, 31 L. R. A. (N. S.) 423; and *Smythe v. Supreme Lodge Knights of Pythias*, 198 Fed. 967, and although his findings cover a wide range, it is the essence of the holding of the trial judge. In the *Wright* case, the whole contention of respondent is stated as follows, quoting from *Ayers v. Grand Lodge, A. O. U. W., State of New York*, 188 N. Y. 280, 80 N. E. 1020:

"While the defendant may doubtless so amend its by-laws, for instance, as to make reasonable changes in the methods of administration, the manner of conducting its business and the like, no change can be made which will deprive a member of a substantial right conferred expressly or impliedly by the contract itself. That is beyond the power of the legislature as well as the association, for the obligation of every contract is protected from state interference by the Federal Constitution."

This holding is sustained by many New York cases, which are referred to and freely quoted by the writer of the opinion.

It may be fairly said that all cases holding as do the New York cases, do so upon the theory that the society and the members are contracting parties, the one assuming to pay a certain sum in event of certain contingencies, in consideration of intermittent payments by the other pending the happening of the event. Of necessity, then, our first inquiry must go to the character and nature of the contract or certificate.

It is elementary that a contract must have parties—a promisor and a promisee. We cannot assure ourselves that respondent bears or has ever borne the one relation to the society to the exclusion of the other. The society is not organized for profit and, from the nature of things, is no more than its membership, in whom all rights and all obligations are mutual. The so-called Tent, Great Tent and Supreme Tent are not separate entities, any more than a legislative assembly is an entity distinct from the people of a commonwealth. It is an institution for convenience only; a vehicle for the collection and disbursement of funds necessary to meet the mutual obligations of the members. *Barrows v. Mutual Reserve Life Ins. Co.*, 151 Fed. 461.

"In the ordinary sense a fraternal order is not an insurance company." *Peterson v. Manhattan Life Ins. Co.*, 244 Ill. 329, 91 N. E. 466.

The membership of such societies speak in mutual conclave through selected representatives, whose voice is their voice and whose act is their act.

"Every member, in fact, stands in the peculiar situation of being party of both sides, insurer and insured." *Korn v. Mutual Assurance Society*, 6 Cranch (U. S.) 192.

"Insurance on the mutual plan being different from insurance on the old line plan, the members of the company are, so to speak, partners." *Haydel v. Mutual Reserve Fund Life Ass'n*, 98 Fed. 200.

"The contractual relations between the members and the association should not be measured by the standard, or determined by the legal principles, which are applicable between an ordinary insurance company and the holder of one of its policies. The insured are members of the association; each has a voice in all proceedings pertaining to its business or general welfare, and in some ways it assimilates a partnership." *Miller v. National Council of Knights and Ladies of Security*, 69 Kan. 234, 76 Pac. 830.

"The fraternal plan, with mutuality and without profit, distinguishes the work of such an association from a commercial enterprise." *Reynolds v. Supreme Council of Royal Arcanum*, 192 Mass. 150, 78 N. E. 129, 7 L. R. A. (N. S.) 1154.

"The defendant was organized upon the principle of equality and mutuality among its members, and it must have been fairly within the contemplation of the parties that changes of membership might necessitate changes in rates, in order to preserve that equality . . . Each member of the society is an insurer, as well as an insured, . . . The argument that the amount of the assessment was as fixed and unalterable as the amount of benefit to be paid entirely overlooks the purpose and character of the defendant and the dual relation of its members." *Mock v. Supreme Council of Royal Arcanum*, 121 App. Div. 474, 106 N. Y. Supp. 155.

The latest expression of this principle is found in *Hartman v. National Council of Knights and Ladies of Security* (Ore.), 147 Pac. 931, where it is said:

"The contract is not purely between the individual member and the corporate organization. It is in spirit and in truth a covenant, not only with the central body, but with every other individual participating in the benefits afforded by the project, for the concern is mutual, and the co-opera-

tion of every member is essential to its success as an insurance society . . . Moreover [she was] controlled . . . by the terms of her certificate and the laws of the order, which are made a part thereof, and to which she was subject, having had her part in the enactment of the same through her representatives."

There being no contract in the commercial sense, but a mutual promise of every member to pay the certificate of every other member, there can be no vested right in any provision of the contract, either express or implied, that is not subject to and controlled by the duty of the member to pay the cost of his own insurance, for under no construction of a mutual contract can he demand more than he is willing to give.

"Each member participates in the business results and as there are profits or losses, so is his insurance affected in its cost to him." *Swan v. Mutual Reserve Fund Life Ass'n*, 155 N. Y. 9, 49 N. E. 258.

A member cannot throw his brothers overboard under the guise of contract and vested right. He must share his life belt with all. If it is not strong enough to sustain him he is in duty bound to sink to the same level with his fellow members, for whatever the words of his contract may imply, it is to be measured by the object of the society which he has bound himself to support.

The error of the New York case and the Federal case, relied on by respondent, is fundamental. It is assumed that the subject-matter of the contract is a promise to pay $1,000 at the death of the member, in consideration of a sum named. This is but one of the things to be considered. If we are to make any one consideration paramount over another, it must necessarily be the object of the society. When that is considered it cannot be said that any one member, or any number of members who have joined the society upon a misconception of the ability of the members to meet their mutual

obligations by the assessments agreed upon, can disassociate his own certificate or contract and insist that the object of the fraternity or society is to pay him in full without reference to his fellow members. The society being mutual and every member being subject to the same burdens and entitled to the same benefits, it follows that the society cannot be sustained unless the supreme representative body is granted authority to do that which will bring the greatest good to the greatest number. Or it being possible, in the light of present experiences, to do that which will reasonably insure the payment of all certificates, the agreement made by the member when accepting his certificate to abide by all the laws, rules and regulations of the society that may have been or that might thereafter be passed, binds him to observe such legislation as is calculated to insure a rate sufficiently adequate to pay the cost of his own insurance.

"Mutuality is its controlling feature. It is obvious, therefore, that for a benefit bestowed on one member, there must be a corresponding burden imposed on the other members collectively, and that a proper adjustment of the benefits to the burdens is essential to its existence as a mutual organization. The constitution is the fundamental compact between the members, and usually, as in the present instance, outlines the plan for the distribution of the benefits and adjustment of the burdens among them. Unerring foresight is not the gift of any man or body of men, and experience alone can demonstrate whether the plan authorized by a constitution is the best or even practicable. The welfare of the association, if not its existence, may demand a change in the constitution and a readjustment of the relations between the benefits and burdens. The association is a self-governing body, and it is for its members to determine when such change is required or advisable." *Hall v. Western Travelers Acc. Ass'n,* 69 Neb. 601, 96 N. W. 170.

"To justify interference by the courts and warrant the overthrow of by-laws enacted in the mode prescribed by the by-laws, it must be shown that there was an abuse of power, or that the later by-law is unreasonable. It is not enough to show that a better or wiser course might have been pur-

sued, for it must be shown that there was an abuse of discretion, or that the by-law is so unreasonable as to be void. We do not affirm that a benefit society may, by a change in its by-laws, arbitrarily repudiate an obligation created by a policy of insurance, but we do affirm that, where a change is regularly made in its by-laws, and the motive which influences the change is an honest one to promote the welfare of the society, and the members are all given an opportunity to avail themselves of the change, no actionable wrong is done the members or their beneficiaries. It may sometimes happen that the interests of one individual, or of a few individuals, may be impaired, but it is the right, and, indeed, it is the duty, of the society to protect the interests of the many rather than of the few. Persons who become members of such societies must take notice of this, and one person cannot, therefore, demand that the welfare of the society and the interests of the many be sacrificed for his sole benefit." *Supreme Lodge, Knights of Pythias v. Knight,* 117 Ind. 489, 20 N. E. 479, 3 L. R. A. 409.

Nor are these observations met by the suggestion that appellant was in a way lured into an improvident undertaking by the provision of the by-law fixing rates which we have quoted, the speeches of the officers of the Supreme Tent, or other matters tending to show an estoppel. There being no contract in the strict sense, there can be no estoppel. When respondent joined he agreed, in consideration of a promise on the part of other members to pay him a certain sum, that he would, in turn, do all that would be required of him. He became an insurer as well as an assured. He cannot get away from his associates if he would. He must meet his obligation to them, and all this legislation does is to call upon him to pay his own cost as a member. To this end he agreed to be bound by the laws and rules of the order and such changes as might thereafter be made.

"There is no vested right in having the contract in the certificate remain unchanged, because the recognition of the power to make new by-laws is necessarily a recognition of the right to alter or amend those theretofore made." *Klein v. Knights & Ladies of Security,* 79 Wash. 173, 140 Pac. 72.

In the same case we said:

"To destroy a vested right arising out of a contract is, in some way, to impair or destroy the rights guaranteed by the contract; not to enforce them."

It seems idle to attempt to add to the force of this language. If we were to attempt it, we would say that there can be no vested right in any contract so long as a duty to the other contracting parties rests upon the one asserting it and his duty is unperformed.

It is lamentably true that most if not all of the fraternal benefit associations with which courts have been called upon to deal in recent years were founded upon false assumptions and self deceptions; a purpose to make something out of nothing; to have others do for us, without doing our whole duty to ourselves and to them. And the pity of it all is that those who promoted and organized such associations, as well as those of us who have joined them, were undoubtedly honest in our beliefs. We did not know the horse was blind until we took him out on the road. Insurance societies have been generally organized and built up among young men. Low death rates for the first few years made a show of prosperity. Time, the increasing age and mortality of the membership, has brought them face to face with the problem of paying those who die in age, as they have paid those who died in youth. It took nearly fifty years for the truth to rise to the surface of our infatuations, and the consequent realization that a new member who in fact was not paying the cost of his own insurance was a liability and not an asset. We were foolishly blind to the simple equation that if ten men mutually promise to pay each other $1,000 at death, $10,000 must be gathered from the promisors if all of the contracting parties are to be paid. To illustrate, it is asserted in the briefs, and is not denied, that respondent, between the time he joined the order and the time he brought this suit, had paid into the order $169. If he should attain the age of

seventy years he would have paid in an additional $162, at twelve assessments per year. Wherefore then can he claim that the society, himself and his co-members, shall continue a plan that must surely bring inevitable ruin and leave the greater part of its certificates unpaid, when a resort to business principles will insure stability? At fifty-five his life expectancy is 17.40 years. If he pays an assessment at the new rate from now on he will have paid in at the expiration of that time $626.40, which added to $169 makes a total of $795.40, which we may assume will be sufficiently increased by interest accumulations to make up a sum sufficient to mature his certificate or meet his obligation to the society, whichever way it is put. Hence respondent was bound to know, as were all members of the society, that their plan was inadequate; as much so as if they had each agreed to pay in so much from month to month for a term of ten years and buy a piece of property at a certain price. No one could thereafter claim imposition or fraud, when a simple calculation would have shown that the net accumulations would not be more than fifty per cent of the necessary amount.

"The theory that a mutual association can afford to carry its members at less than cost on account of its increasing membership is as fallacious as that of the merchant who said he could afford to sell goods at less than cost because he sold so many of them." *Supreme Ruling of Fraternal Mystic Circle v. Ericson* (Tex. Civ. App.), 131 S. W. 92.

For these reasons it is held by the greater number of cases and, as we think, by the greater weight of authority, that it is within the legislative power of these associations to increase rates to the plane of adequacy. As said by the supreme court of the United States:

"There is no vested right to a continuation of a plan of insurance which experience might demonstrate would result disastrously to the company and its members." *Wright v. Minnesota Mutual Life Ins. Co.*, 193 U. S. 657.

The test of a vested right is thus defined in 3 Am. & Eng. Ency. Law (2d ed.), p. 1065:

"The true criterion appears to lie in the determination of the question whether or not an actionable property right has in fact accrued; if so, it cannot be divested; but it is otherwise in case such rights are only prospective, or in process of accruing, when they may be changed or arrested by the association under the general governing power, provided the member, in his contract of membership, has agreed to conform to after-enacted laws."

This definition is sustained by practically all of the authorities. Respondent has no right to insist that the society shall carry his certificate at a loss because of the form of the by-law at the time he took out his certificate. His position is not tenable, for no member of a mutual insurance society has a right to insist that it continue to do business upon an unsound basis for his individual benefit.

Respondent complains that, in the plan proposed, no attempt was made to meet the alleged deficiency in rates by a general increase upon all of the members; that the entire burden is cast upon those who attain the age of fifty years, thus forcing members of fifty-five years and over into a class to take care of themselves as if there were no other members. Respondent overlooks the fact that the mortality tables show that, at about the age of fifty-five, the adequacy of the original system begins to break down. It is not an arbitrary age or date fixed by the society producing a class distinction. It is the working of the law of experience, which has demonstrated that the danger of default to the members among these societies has increased under old plans in geometrical proportion after the member has reached an age, approximating fifty-five years.

However, it would seem that in these days of understanding, born of experience, that the fallacy of the "new blood" theory had been exploded, or if there had ever been anything in it, that no lodge could hope to succeed by loading the rate upon men still young enough to find insurance at cost, or

upon men who have been paying their own way, to make up a deficiency for those who had not.

"The new blood theory is simply a method of selling obligations to mature in the future at less than their face or cost, and using the money thereby obtained to temporarily meet the maturing obligations of the institutions. It works out simply to the end of accumulating liabilities for which no provision has been made, and for which, under the cumulative force of increasing obligations maturing more and more rapidly, no provision can be made in the end, and thereby results in ultimate bankruptcy." Anon.

If we assume that a society might lawfully load young men and new members to make up the valuation (See Laws of 1911, Ch. 49, p. 292, § 229; (3 Rem. & Bal. Code, § 6059-229), the result would in all probability be disastrous. The young man in health would most likely go into some order where he would not be subject to such an imposition. There would be no new members.

"The chief complaint seems to be that other younger men were not raised so much in their assessments, and some were even reduced; but this was the result of making the basis of assessment the age of the member and the estimated cost of his insurance. It was evident that the old plan was a failure, and the court of chancery appeals report that some change in the assessment plan was necessary to accomplish the objects and purposes of the order and to save it from dissolution. It must be evident that the younger men would not be burdened with the heavy cost of insurance upon the older ones, and they would not join the order, and would withdraw, if such a rule was attempted; and this would leave the older men with no one but the old ones upon whom to rely for their protection. As we view it, the effect of this rule was only to accentuate the disabilities of old age, after the insured had enjoyed indemnity for many years at less than cost; and we cannot see that the basis of assessments was unreasonable." *Conner v. Supreme Commandery Golden Cross*, 117 Tenn. 549, 97 S. W. 306.

Respondent says that if the whole burden is put upon the old members he will be turned out and all fraternal features of

the society destroyed. This may be true in a sense, but experience has no doubt taught the lesson that the fraternal features of these societies cannot be depended on to mature deficiencies in other men's certificates running into the millions. Fraternity that will adorn a ritual is one thing; fraternity that will balance the debit side of the ledger is quite another thing. Each life must pay the cost of its own experiences and the penalties attaching to its own mistakes.

There are some cases which would sustain the decree of the lower court, but the great majority of the courts have held to the contrary. Among the more prominent cases sustaining our view and which we have not already cited in this opinion, are: *Gaines v. Supreme Council of Royal Arcanum*, 140 Fed. 978; *Gaut v. Mutual Reserve Fund Life Ass'n*, 121 Fed. 403; *Schmierer v. Mutual Reserve Fund Life Ass'n*, 153 Cal. 208, 94 Pac. 887; *Champion v. Hannahan*, 138 Ill. App. 387; *Supreme Lodge Knights of Honor v. Bieler* (Ind. App.), 105 N. E. 244; *Messer v. Grand Lodge, A. O. U. W.*, 180 Mass. 321, 62 N. E. 252; *Wineland v. Knights of Maccabees of the World*, 148 Mich. 608, 112 N. W. 696; *Williams v. Supreme Council of the Catholic Mut. Benefit Ass'n*, 152 Mich. 1, 115 N. W. 1060; *Shepperd v. Bankers' Union of the World*, 77 Neb. 85, 108 N. W. 188; *Clarkson v. Supreme Lodge Knights of Pythias* (S. C.), 82 S. E. 1043.

Respondent concedes the right of a society to increase rates from time to time if it has reserved the right to do so in its by-laws. He seems to distinguish the cases upon which appellant relies, by asserting that in none of them was there an assurance in the by-laws that the rate would continue for the life term. There is apparent ground for this contention, but it does not bear the test of reason. For, after all, the so-called warranty is a by-law. The right to amend does not except any one or more of the by-laws. It is a general reservation. And furthermore, there can be no difference in principle between an assertion in the by-laws that the member will be required to pay no more than the published rate during

his life, and the publication of the rates without such assurance. When it is remembered that the rates of such societies are almost always fixed in their by-laws, and that members join upon the understanding that they are taking a life certificate at a certain rate for life, we cannot escape the conclusion that there is no ground upon which the cases can be distinguished. In the one, the so called contract is express, in the other it is implied. When reduced to their lowest terms, the fact that some cases hold one way and some another way is apparent to all. It will not be asserted that respondent did not assent to a representative form of government. It is provided for in the same way as the rates are fixed, by a by-law. The representative body has spoken for him. Its act is his act and is binding upon him, so that

"Whether this reasoning is strictly correct we need not decide, for here we have an objecting member, who on his own account has agreed not only to conform to the present laws of the order, but also to such future laws as may be from time to time enacted by the official body governing the same, and as to such contracts the better reasoned cases hold that assessments may be raised by such societies under such reserved power to amend by-laws." *Supreme Lodge Knights of Honor v. Bieler, supra.*

Neither are we prepared to hold that the increased rate is a violation of respondent's contract. Under his certificate as written, the society might levy any number of assessments. He agreed, in consideration of the promise of his fellow members to pay his beneficiary $1,000 at death, to pay all assessments necessary to meet death losses. It was held in *Wineland v. Knights of Maccabees of the World, supra:*

"We have no doubt that it was lawful, and no violation of contract rights, for defendant to increase the number of assessments to meet the demands arising from the death of members. There seems to be no good reason why fewer assessments, at a greater rate, should not be levied, so long as the increase in rates is proportional; young and old members, alike, contributing. Whether such action be a mere detail

in management aimed at procuring for distribution the same sum of money in a different way, or intended to actually increase the contributions over present necessities for distribution and to accumulate a fund, it may be, so long as it is proportional and reasonable, supported, as against a protesting member, by his agreement in his application to conform to and be governed by laws to be from time to time made by the representative governing body of the association."

See, also, *Supreme Lodge of Fraternal Union of America v. Ray* (Tex. Civ. App.), 166 S. W. 46.

Although it is not necessary to our decision, it may well be questioned whether a court of equity could interfere to protect respondent. His grievance goes not to the amount of his assessment, for the society could levy a like amount under its old rates, but to the method. Having in mind the character of the society and its objects, it would seem that there is no room for equitable interference, for by his assent to unlimited assessments, respondent has subscribed to the right of the society to perpetuate itself. In law he has acknowledged that

"There must be a premium *somewhere* which represents the normal cost of permanent insurance, which is based upon the law of mortality, and below which point no organization, on any plan, can safely promise permanent insurance protection at a uniform price for life." Anon.

Respondent further contends that, inasmuch as there is a reserve fund of something like $12,000,000, the society cannot raise his rate until that is exhausted. In other words, granting the right to the society to raise rates in the event of a necessity, that such necessity is not present; that the society is, because of such surplus, in a flourishing and prosperous condition.

It is likely that there is no word in the lexicon of business terms so little understood or so misapplied as the word surplus or reserve, when used in connection with mutual insurance companies or societies. A surplus accumulated over the necessities of an old line life company is a tangible thing to

which any policy holder or creditor may look for the satisfaction of his claim. It is an asset of the company. On the other hand, an apparent surplus of a fraternal society may be merely a mortality fund, or an accumulation to meet a deficiency in rates, so that in the end the accumulation will balance the deficiency. It generally represents a loading, over what may be called a possible minimum contract rate. It is a modern thing among fraternal societies. Indeed, the thought was generally discountenanced in their earlier years. Necessity has driven them into the only open port. An accumulation to balance the deficiency in rates is a bridge over which the society may pass from the quicksands of bankruptcy to the high ground of business solvency. The surplus or reserve, whichever it may be called, is a trust fund, and in that sense is in truth a liability and not an asset. Its purpose is to pay death claims, not to retire policies during the life of the member; and until it is shown that the society is collecting more than is reasonably necessary to insure its solvency, no living member can claim a remedy or an individual interest in it. Under the record before us, the so called surplus is a mortuary fund. The member has no vested interest and no power to control its disposition during his life. Its disposition, within legal bounds, is for the officers duly elected and authorized to act for the society. Niblack, Benefit Societies and Accident Insurance (2d. ed.), p. 238; *Kentucky Mutual Security Fund Co. v. Turner*, 89 Ky. 665.

A like contention was made in the *Ericson* case, and answered in this way:

"The facts show that appellant had paid all death claims and other benefits that had accrued, and had left in its treasury in 1908 $225,000 subject to the payment of such claims as there should thereafter accrue. But that appellant was therefore 'in good financial condition,' or that this sum was 'surplus assets over all liabilities,' is a *non sequitur*—a fallacy that has proved the undoing of many life insurance companies, and especially fraternal associations. What are the

assets of a life insurance company? The money which it has in its treasury and the money which it will hereafter be able to collect under its contracts with its policy holders, above its necessary expenses. What are its liabilities? The amounts unpaid on claims that have already accrued and the amounts which it has promised to pay by its contracts of insurance which will accrue in the future. If its assets exceed its liabilities as thus stated, it is in good financial condition; otherwise it is not. Many fraternal insurance orders honestly conducted have been lured to their destruction by this mirage apparent of accumulated surplus during the early period of their existence. Among institutions born of the wisdom, philanthropy, and altruism of modern times, none are more capable of or are accomplishing greater good than mutual fraternal benefit societies, and it is encouraging to see some of them awakening from this delusion to which too many of them have been given over. A mutual insurance association has no capital stock, and can pay its policy holders only out of the money paid in by them and the accumulated interest thereon. A statement of its affairs at an early period of its existence may show what is frequently called a surplus, when it is hopelessly insolvent in the sense that it cannot possibly meet its future obligations. ·. . . In 1907 this order had insured its members in the sum of $39,937,000. This was its liability. Its real assets were not the so-called $225,000 surplus in its treasury, but the amount that it would collect from its members in the future. Whether or not it was in good financial standing depended upon the adequacy of its rates, which it appears was not considered by the court."

The insurance code seems to have been drawn upon this theory. After declaring that societies may create and invest a surplus, and that the society may grant paid up or extended insurance if so provided by the laws of the society, it says:

"Such grants shall in no case exceed in value the portion of the reserve to the credit of such members to whom they are made." Laws of 1911, p. 279, § 210 (3 Rem. & Bal. Code, § 6059-210); and

"No member or beneficiary shall have or acquire individual rights therein or become entitled to any apportionment or the

surrender of any part thereof, except as provided in section two hundred ten." Laws 1911, p. 281, § 214 (Id., § 6059-214).

The reserve is still far short of the deficiency in appellant's contracts, and inasmuch as the undisputed facts show that respondent has not met the cost of his own insurance, it follows, if his argument were otherwise sound, he has no interest in the reserve.

Respondent contends that his contract has been violated in this, that his insurance has been changed from a semi-endowment policy maturing at the age of seventy years, to a straight life policy. We do not concede that this question is before the court at the present time, although some of the authorities cited in this opinion sustain the right of the society to make such change.

Neither has respondent a right to rescind and recover the amount paid as dues and assessments. The society has not repudiated its contract; it is endeavoring to perform it. Respondent's contributions to the society have not met the cost of carrying his certificate, and so long as he has had protection for less than cost, he cannot complain.

This is the first time the question raised by this appeal has been before our court. Because of its importance and the far reaching effect of our decision, we have endeavored to make it plain that a member of a beneficiary society having a democratic or representative form of government has no right, under a certificate providing for a change of by-laws, as does the certificate held by respondent, that can be called vested, except a right to insist that the face or amount to become due under his contract shall not be lessened or impaired; that the object, plan, spirit and purpose of such a society is written into its certificate; that the true meaning of the promise to obey its rules and regulations and such changes and amendments as thereafter may be made is that the society may from time to time correct its mistakes, or take such steps as may be necessary to keep its promises, and further, where it appears to be necessary, it is a recognition

of a duty resting upon the society so to do; that a member has a vested interest only in the object of the society, and in turn impliedly agrees, notwithstanding the state of the by-laws at the time of joining, that the society may so legislate that its certificates, whether matured by death or time, will be worth their face; that the accomplishment of this purpose is a mere detail, and so long as all members similarly situated are treated alike and no member is called upon to pay more than the cost of his certificate, as may be determined by the mortuary and experience tables recognized by the laws of this state, there can be no just cause of complaint on the part of any one; that a by-law fixing impossible rates, followed by a clause saying that such rates shall continue so long as the member remains in good standing, is to be measured by the objects of the order and is of no higher order than any other by-law, for the very evident reason that the object of the society to pay the face of each certificate cannot be accomplished unless such by-law is amended.

It may seem that our holding works a hardship to those of us who became members in our younger days, but the mistake was ours. The society was not to blame. Our mistake was its mistake; but whatever the result may be to those of us who have passed the age limit, we have had insurance for which we have paid less than cost, and under the holding of the courts and legislative enactments in most of the states, such mistakes will not occur again, and fraternal insurance will be in the end what it assumed to be in the beginning— insurance at cost, and as sound as any insurance of whatever kind can be.

It should not be understood that we are holding that a member has no remedy against the fraudulent and arbitrary acts of the officers of a fraternal society. The question in this case goes solely to the power to legislate in representative assembly, and whether such legislation can affect respondent's initial rate of assessment. If we have not made these things plain and our reasoning is so far faulty, it would seem that our holding is nevertheless compelled by a consideration of

the provisions of the insurance code, Laws of 1911, p. 161, ch. 49 (3 Rem. & Bal. Code, § 6059-1 *et seq.*).

That these societies were organized, and for many years have continued to do business, upon a fundamentally unsound basis has become known to all who have had the interest or the courage to make a simple arithmetical calculation. It has been found that, in so far as maturing certificates upon the lives of members is concerned, fraternity is not always a dependable factor. This condition became apparent to most of these societies a long time ago, and some of them have attempted to meet the situation by their own efforts and by appropriate legislation within their governing bodies. Progress has been slow. Men are loath to lose faith in their ideals. Wherefore, to insure the future stability of societies then doing business, and to prevent the organization by designing men of new societies with inadequate rates and which could not be promoted, in the light of the experience of other societies, without practicing fraud upon prospective members, the state, in the exercise of its sovereign right to regulate insurance companies, has defined the status of fraternal benefit societies and provided the terms under which they may do or continue to do business in the state of Washington. Laws of 1911, p. 281, ch. 49, art. VI, § 214 (3 Rem. & Bal. Code, § 6059-214). It provides:

"That no society, domestic or foreign, shall hereafter be incorporated or admitted to transact business in this state, which does not provide for stated periodical contributions sufficient to provide for meeting the mortuary obligations contracted, when valued upon the basis of the National Fraternal Congress Table of Mortality,"

and that after 1913 all societies now doing business in the state shall be subject to the law. It provides for annual reports to the insurance commissioner and a valuation of existing and outstanding certificates and a standard of valuation, and further,

"The laws of such society shall provide that if the stated periodical contributions of the members are insufficient to pay

all matured death and disability claims in full and to provide for the creation and maintenance of the funds required by its laws additional, increased or extra rates of contribution shall be collected from the members to meet such deficiency; and such laws may provide that, upon the written application or consent of the member, his certificate may be charged with its proportion of any deficiency disclosed by valuation, with interest not exceeding five per cent per annum." Laws of 1911, p. 290, art. VI, § 228 (3 Rem. & Bal. Code, § 6059-228).

And further, that if the valuation shows a deficiency of more than ten per cent, the society must reduce such deficiency at a rate of not less than five per cent each three years succeeding. Section 229, p. 292 (Id., § 6059-229). It is made the duty of the insurance commissioner to wind up the affairs of any society which has not complied with the law or is not carrying out its contracts in good faith (we take it that good faith is to be measured not by the intent, but by the statute). Section 230, p. 293 (Id., § 6059-230).

The rate fixed by the society for the respondent, and which by reference to the statute we are bound to assume is necessary to mature his certificate, being no higher than the National Fraternal Congress rates, it follows that respondent cannot complain, for the society has done only what the state would have required but for its voluntary action. The law of the state is a part of every contract of insurance. *Finnell v. Franklin*, 55 Colo. 156, 134 Pac. 122.

"Compliance with the general laws of the state affecting such corporations [Benevolent and Beneficial Associations] is as essential to their continued existence as to their creation." 3 Am. & Eng. Ency. Law (2d ed.), p. 1049.

This is a suit in equity, and the allowance of costs is a matter within the discretion of the court. The case has an importance to the appellant aside from the reversal of the case. It is a test case which affects, not alone the respondent, but every member of the society. A penalty should not be put upon a member because he has seen fit to question the act

of the appellant in raising its rates.    The briefs and abstract filed by appellant are, in the judgment of the writer of this opinion, unnecessarily long, and if costs were allowed for them it would, in a way, operate as a penalty.    Considering, then, the nature of the case and the good faith of the respondent, and the fact that the opinion affects every member of the order, we have decided that the costs shall be borne by the appellant.

The decree of the lower court is reversed, and the cause remanded with instructions to enter a decree denying to respondent the relief prayed for in his complaint.

MORRIS, C. J., MOUNT, and PARKER, JJ., concur.

HOLCOMB, J., took no part.